**FIRST DIVISION**
**PHIPPS, C. J.,**
**ELLINGTON, P. J., and BRANCH, J.**

NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**March 10, 2014**

# In the Court of Appeals of Georgia

A13A2246. WHATLEY v. THE STATE.

BRANCH, Judge.

Horance W. Whatley appeals from orders of the Walton County Superior Court denying his plea in bar on double jeopardy grounds and his plea in bar based on an alleged violation of his constitutional right to a speedy trial. Whatley contends that the trial court erred in denying his double jeopardy claim because the evidence showed that the prosecutor intentionally provoked a mistrial for the purpose of having the opportunity to retry Whatley under more favorable circumstances. He contends that the trial court erred in denying his speedy trial claim because when ruling on this claim, the trial court considered only the amount of time that had elapsed since Whatley's first trial ended in a mistrial, rather than the entire amount of time that had elapsed since Whatley's arrest on the charges at issue. We find no error and affirm.

The record shows that Whatley was arrested on May 20, 2008, on charges of sexual battery, enticing a child for indecent purposes, child molestation, cruelty to a child, and sexual assault. The victim of Whatley's alleged acts was his then seven-year-old daughter, B. W. Whatley was released on bond within two days of his arrest, and has remained free on bond since that time. On December 18, 2009, Whatley was indicted on one count of child molestation, one count of sexual battery, and one count on enticing a child for indecnt purposes. He thereafter appeared at calendar calls and announced ready for trial on November 15, 2010, February 7, 2011, and August 8, 2011.

In February 2011, Walton County hired a new prosecutor, who had considerable experience prosecuting crimes against children, and this prosecutor was assigned Whatley's case. Believing that there were some problems with the wording of Whatley's original indictment, the prosecutor re-indicted the case. The new indictment, which was filed on October 28, 2011, charged Whatley with three counts of child molestation and one count of enticing a child for indecent purposes. Following his second indictment, Whatley appeared at calendar calls and announced ready for trial on November 7, 2011, March 26, 2012, and August 13, 2012. Whatley's case was called for trial on October 15, 2012.

At the outset of his case, Whatley had opted for reciprocal discovery under OCGA § 17-16-1, et seq., and was therefore given access to the prosecution's evidentiary file. When reviewing that file, defense counsel noted that law enforcement had advised B. W.'s mother (who was Whatley's ex-wife) to take the child to Children's Healthcare of Atlanta ("CHOA") for a medical exam. Additionally, the file showed that one detective had taken steps to assist the mother in scheduling such an exam. No copy of any medical report appeared in the prosecution's file or was otherwise provided to defense counsel pursuant to the State's continuing discovery obligations. Accordingly, defense counsel assumed that the mother had never taken B. W. for the recommended medical exam.

During opening argument, defense counsel asserted that the case against Whatley was the result of a vendetta by Whatley's ex-wife, who had raised the allegations at issue after Whatley filed a motion to reduce his child support payments. As part of this argument, defense counsel emphasized that despite being advised by law enforcement to take her daughter for a medical exam, the mother had never done so.

The mother was the second witness called at trial. During direct examination, the mother testified that after becoming concerned about B. W.'s behavior, she took

3

the child to a therapist. B. W. made her outcry statement to the therapist, who then reported the child's allegations to the appropriate authorities. Immediately after this testimony, the following exchange took place between the mother and the prosecutor:

> [Prosecutor]:What was the next contact you had after meeting with [the therapist] [and learning about B. W.'s allegations of sexual abuse by her father]? . . .
>
> [Mother]: Well, we, I kept her [B. W.] going to [the therapist]. . . and I had to take her [B. W.] to Children's Hospital in Atlanta.
>
> [Prosecutor]:Okay. And was that for an interview, for a medical exam, or what was that for?
>
> [Mother]: Medical exam.

At that point, defense counsel requested a bench conference, at which he objected to the mother's testimony regarding taking B. W. for a medical exam, noting that the defense had never been provided with a copy of a report of any such exam. In response, the prosecutor stated that he had only recently contacted CHOA to confirm that such an exam had been done and to request a copy of any report that existed, and that a copy of a report was being faxed to the State, but they did not yet have it.[1] The prosecutor further noted that he knew he could not use the exam findings at trial, as

---

[1] The faxed copy of the report of B. W.'s medical exam was delivered to the prosecutor during the bench conference.

4

the report had not been in the State's possession and therefore had not been produced to the defense prior to trial. He believed, however, that the mother could testify as to the fact that an exam was performed.

The defense moved for a mistrial, based on the fact that the State had failed to inform Whatley's attorney that B. W. had undergone a medical exam and, as a result, defense counsel's credibility had been compromised by his opening statement. The trial court granted the motion but specifically refrained from making a finding as to whether the prosecutor had acted deliberately, for the purpose of goading a mistrial.

A copy of the report of B. W.'s medical exam was subsequently filed with the trial court. The report contains nothing that obviously inculpates or exculpates Whatley. All findings are "normal," and the exam showed no signs of sexual penetration or other activity. The examiner noted, however, that because B. W. reported it had been more than six weeks since she had seen her father, any possible signs of sexual abuse would have likely healed prior to the exam.

Following the mistrial, Whatley filed two plea in bar motions: one based on the State's alleged misconduct in causing the mistrial and one based on an alleged violation of Whatley's constitutional right to a speedy trial. The trial court held a hearing on these motions on February 21, 2013, at which both the prosecutor and

defense counsel testified. The prosecutor testified that after striking a jury on the first day of trial, he returned to his office after 3:00 p.m. and reviewed the file. During that review, he noticed for the first time that the police had advised the mother to take B. W. for a medical exam. The prosecutor then directed his investigator to contact CHOA to see if they had a record of any such exam. That same day, the investigator phoned CHOA and sent a follow-up email at 4:50 p.m., asking whether an exam had been performed. In her email, the investigator also stated that if such an exam had been performed, the State was requesting a copy of the report.

The following day, the prosecutor reported to court at approximately 8:15 a.m. for a motions hearing in the case. Trial began at approximately 9:00 a.m., with the giving of opening statements. At 10:01 a. m., a representative of CHOA responded to the investigator's email, stating that B. W. "was seen on May 8, 2008[2] for a medical exam at the Child Protection Center," and asking for a fax number to which CHOA could send a copy of the report of that exam. The prosecutor was copied on that email, which came to his cell phone while he was conducting his direct examination of B. W., the first witness at trial. At some point after coming to court that morning but

---

[2] When received, the report showed that the exam had actually been performed on May 22, 2008.

6

before putting the mother on the stand as his second witness, the prosecutor confirmed with the mother that she had taken B. W. for the medical exam.

When asked why he had not revealed the fact of the medical exam to defense counsel before trial began that day, the prosecutor stated that prior to reviewing the case file following jury selection, he had never even asked whether an exam had been performed because, based on his discussions with the mother, he believed that no exam had been done. He then explained:

> And it made sense to me that [the mother] wouldn't have [taken B. W. for a physical exam] because of the disclosure. The disclosure was kissing on the mouth, . . . the defendant putting his penis between [B.W.'s] legs, and . . . touching her buttocks with his penis, . . . on the outside of [her] clothes. There definitely wasn't any indication of penetration . . . so it didn't surprise me that there wouldn't be [a physical exam] in that case . . . because I wouldn't have expected there to be any findings one way or the other.

The prosecutor further explained that prior to B. W.'s testimony, he did not even have written confirmation that a medical exam had occurred or that a written report of that exam existed. Rather, all he had was an oral statement from the mother that the exam had occurred, and he was not required to disclose oral witness statements. Specifically, the prosecutor stated:

I didn't have any intent about . . . hiding or not disclosing. It [the fact of the exam] was information that [the mother] told me, and so I asked her about it on the stand. . . . [T]hat's honestly how it was. It wasn't some tactical means to try to get a[n] improper angle on things. It was information she had provided to me in an oral statement and I didn't have anything to turn over at that time, so I went forward with what I had.

During his testimony, defense counsel admitted that he had never asked the mother if she had taken B. W. for a medical exam, even though he had spoken with her in person about the case three days before trial began. He also acknowledged that he had never asked the prosecutor's office whether a medical exam had been performed on B. W., nor had he made an inquiry to CHOA as to whether they had a record of such an exam. Rather, because the prosecutor's office never informed him that B. W. had undergone the recommended medical exam or provided him with a copy of a report of such an exam, he simply assumed no exam had been performed. As defense counsel explained:

I guess my assumption was that, if – it was very clear in the discovery materials that [the mother] had been asked to get an exam [performed on B. W.]. Subsequent – at initial discovery and then follow-up conversations with the assigned prosecutor didn't indicate one had been done. And I guess it never occurred to me that one would have actually

been done and nobody would have ever followed up to find out. So. . . [m]y assumption was that the District Attorney's office . . . I just assumed that, if one had been done, they would be aware of it and they would obviously provide me that information.

Based on the testimony and evidence presented at the hearing on Whatley's motions, including the results of B. W.'s medical exam, the trial court denied Whatley's plea in bar on his claim of double jeopardy, finding that Whatley had failed to show the State had engaged in deliberate misconduct for the purpose of goading a mistrial. Additionally, the court denied Whatley's plea in bar based on the alleged violation of his constitutional right to a speedy trial. In denying this motion, the court held that the time for calculating the existence of a speedy trial violation began following the declaration of the mistrial, and that there had been no delay by the State in scheduling Whatley's second trial. Whatley now appeals from these orders.

1. When a defendant successfully moves for a mistrial based on alleged prosecutorial misconduct, the general rule is that the Double Jeopardy Clause does not bar a retrial. *State v. Traylor*, 281 Ga. 730, 731 (642 SE2d 700) (2007). Retrial will be prohibited, however, where the defendant can show that the prosecutor acted deliberately, in an attempt to goad the defendant into moving for a mistrial. Id. To prevail on such a claim, the defendant must prove "that the State was purposefully

9

attempting through its prosecutorial misconduct to secure an opportunity to retry the case, to avoid reversal of the conviction because of prosecutorial or judicial error, or to otherwise obtain a more favorable chance for a guilty verdict on retrial." (Punctuation omitted.) Id. at 731-732, quoting *Davis v. State*, 278 Ga. 305, 306 (1) (602 SE2d 563) (2004). "What is critical is the objective of the prosecutor's improper conduct. . . . Actions of the prosecutor constituting even intentional prosecutorial misconduct do not raise the bar of double jeopardy, . . . unless the prosecutor's actions were intended to subvert the protections afforded by the Double Jeopardy Clause." (Citations and punctuation omitted.) *Dinning v. State*, 267 Ga. 879, 881 (485 SE2d 464) (1997).

Whether the prosecutor intended to goad Whatley into moving for a mistrial represents a question of fact, to be determined by the trial court. *Roscoe v. State*, 286 Ga. 325, 327 (687 SE2d 455) (2009). And the trial court's finding on this issue will be upheld on appeal if there is any evidence to support it, including "'circumstantial evidence and the reasonable inferences which flow from'" that evidence. Id., quoting *State v. Thomas*, 275 Ga. 167, 168 (562 SE2d 501) (2002).

The trial court found that Whatley's double jeopardy claim fails for two reasons. First, the court found that the prosecutor had not, in fact, engaged in any

10

misconduct. The court further found that, even if the prosecutor's conduct could be considered improper, there was no evidence that he engaged in this conduct for the purpose of provoking a mistrial. Both of these findings are supported by the record.

With respect to the prosecutor's conduct, the record shows that he did not deliberately withhold any information or reports to which the defense was entitled. Instead, the prosecutor's testimony showed that he was unaware that the mother had even been instructed to take B. W. for a medical exam until after trial had begun and a jury had been impaneled. Additionally, both the prosecutor's testimony and the documentary evidence showed that the State received no written confirmation of the exam until after opening arguments had occurred and testimony had begun. Moreover, although the prosecutor received oral confirmation from the mother, before putting her on the stand, that she had taken B. W. for the recommended medical exam, he was under no obligation to provide this information to the defense. The statutory obligation of OCGA § 17-16-7[3] "is not triggered when a witness merely makes an oral

---

[3] This statute provides, in relevant part, that "the prosecution or the defendant shall produce for the opposing party any statement of any witness that is in the possession, custody, or control of the [S]tate or prosecution or in the possession, custody, or control of the defendant or the defendant's counsel that relates to the subject matter concerning the testimony of the witness that the party in possession, custody, or control of the statement intends to call as a witness at trial."

11

statement. There can be no 'possession, custody, or control' of a witness' statement which has neither been recorded nor committed to writing." (Citation and punctuation omitted.) *Forehand v. State*, 267 Ga. 254, 255 (3) (477 SE2d 560) (1996). See also *Simmons v. State*, 321 Ga. App. 743, 746 (2) (743 SE2d 434) (2013).

Furthermore, it appears that defense counsel was at least as equally responsible as the prosecutor for the failure to discover the existence of B. W.'s medical exam until the morning of trial. Defense counsel admitted that he had noticed, as early as 2008, the note in the prosecution's file directing the mother to take B. W. for a medical exam. Despite this knowledge, however, defense counsel failed to ask the prosecutor, the mother, or CHOA if such an exam had been performed. Rather, he simply assumed that if an exam had been performed, a copy of it would appear in the prosecution's file and/or would be produced during discovery. Under these circumstances, we find no error in the trial court's conclusion that the prosecutor did not engage in any misconduct.

Nor do we find any error in the trial court's ruling that, even assuming misconduct by the prosecutor, there was no evidence the prosecutor acted with the intent of provoking a mistrial. The record reflects that, although it was early in the trial, nothing had happened that would have caused the State to desire a mistrial. The

only witness to testify – B. W. – had given unequivocal testimony that was damaging to her father. And the State had won a significant evidentiary ruling that allowed it to introduce Whatley's use of child pornography. Moreover, the prosecutor had no reason to prompt a mistrial so as to be able to introduce the medical report at a later trial, as that report did nothing to support his case. Additionally, despite Whatley's assertions to the contrary, no evidence supports the inference that the prosecutor wanted a second trial because he had learned Whatley's trial strategy from defense counsel's opening statement. Rather, the logical inference to be drawn from the evidence is that the prosecutor would benefit more from continuing the original trial because, given defense counsel's representation in his opening statement that no medical exam had occurred, the prosecutor had the opportunity to cause the jury to question defense counsel's credibility. In short, the evidence supports "the trial court's conclusions that the State would have nothing to gain from delay and that the prosecutor was aggressively seeking a conviction, not a mistrial. Under these circumstances, it cannot be said that the trial court erred in its . . . denial of [Whatley's] plea in bar on the grounds of double jeopardy." (Citation omitted.) *Roscoe*, 286 Ga. at 327. See also *State v. Maddox*, 185 Ga. App. 674, 676 (365 SE2d 516) (1988) (double jeopardy did not bar retrial of defendant where record supported

13

the conclusion that the State "was attempting to place the prohibited evidence before the jury to enhance the likelihood of [defendant's] conviction," rather than to goad a mistrial); *Traylor*, 281 Ga. at 732-733.

2. Whatley also contends that the trial court erred in denying his plea in bar based on an alleged violation of his constitutional right to a speedy trial.

> The template for deciding all constitutional speedy trial claims under the Sixth Amendment and the Georgia Constitution is laid out in the 1972 case of *Barker v. Wingo* [407 U. S. 514, 530 (IV) (92 SCt 2182, 33 LE2d 101) (1972)] and the 1992 decision in *Doggett v. United States* [505 U. S. 647, 651 (II) (112 SCt. 2686, 120 LE2d 520) (1992)]. The analysis has two stages. First, the court must determine whether the interval from the accused's arrest, indictment, or other formal accusation to the trial is sufficiently long to be considered "presumptively prejudicial." If not, the speedy trial claim fails at the threshold. If, however, the delay has passed the point of presumptive prejudice, the court must proceed to the second step of the *Barker-Doggett* analysis, which requires the application of a delicate, context-sensitive, four-factor balancing test to determine whether the accused has been deprived of the right to a speedy trial.

 (Footnotes omitted.) *Ruffin v. State*, 284 Ga. 52, 55 (2) (663 SE2d 189) (2008). As a general rule, "[t]he constitutional right to a speedy trial attaches either at the time of the defendant's arrest or at the time of his indictment, whichever occurs earlier," and "[a] delay of more than one year between the attachment of the right and the trial

14

raises a threshold presumption of prejudice to the defendant." (Citations and footnotes omitted.) *Hayes v. State*, 298 Ga. App. 338, 339-340 (1) (680 SE2d 182) (2009).

Here, relying on the Georgia Supreme Court's decision in *Brewington v. State*, 288 Ga. 520 (705 SE2d 660) (2011), the trial court held that "when a defendant has actually been tried and the trial ends with a mistrial, 'the relevant time frame for purposes of a motion to dismiss on constitutional speedy trial grounds is from the date of the mistrial . . . through the date the motion was denied.'" (quoting *Brewington* at 521 (2)). The court then found that because only five months had elapsed between the mistrial and the court's ruling on Whatley's motion, there was no presumption of prejudice, Whatley's motion failed at the threshold, and the court need not engage in the second part of the speedy trial analysis.

On appeal, Whatley contends that the trial court erred in relying on *Brewington* and that the correct time period for assessing his speedy trial claim was the 59-month period between his arrest (May 20, 2008) and the trial court's ruling on his plea in bar (April 29, 2013). Thus, he asserts that the trial court erred in refusing to engage in the

second part of the speedy trial analysis and, when his claim is analyzed correctly, he should prevail. We find no error by the trial court.[4]

As an initial matter, we do not believe that the rule set forth in *Brewington* applies to cases where a mistrial was caused by prosecutorial misconduct. The mistrial at issue in *Brewington* resulted from a hung jury, rather than from any misconduct by the State. Thus, we do not read *Brewington* as standing for the proposition that, for the purpose of analyzing speedy trial claims the clock is automatically reset whenever a mistrial occurs, no matter the reason for the mistrial.[5] Rather, we view that case as holding that the time for analyzing a speedy trial claim will be calculated from the date of a mistrial only where the mistrial does not result from any misconduct by the State. *Brewington*, 288 Ga. at 521 (2). See also *Jakupovic v. State*, 287 Ga. 205, 206

---

[4] We note that prior to filing his plea in bar, Whatley had never made a demand for a speedy trial and he had not raised any claim that his rights to a speedy trial had been or were being violated.

[5] Such an interpretation of *Brewington* would conflict with the principle that, in analyzing a speedy trial claim, any evidence which shows "[a] deliberate attempt [by the prosecution] to delay the trial in order to hamper the defense," must be considered and "weighted heavily against the government." (Footnote omitted.) *Barker v. Wingo*, 407 U. S. at 531 (IV). See also *Ruffin*, 284 Ga. at 59 (2) (b) (ii) ("[d]eliberate delay to gain an improper advantage over the accused strikes at the very heart of the speedy trial guarantee") (citation and footnote omitted); *Brannen v. State*, 274 Ga. 454, 455 (553 SE2d 813) (2001).

16

(1) (a) (695 SE2d 247) (2010) (the delay in bringing the defendant to trial was calculated beginning with the date of the order granting defendant's motion for a new trial, where the grant of that motion was based on ineffective assistance of trial counsel, rather than on any error or misconduct by the State).

As discussed in Division 1, however, the record in this case shows that the prosecutor did not engage in any misconduct, deliberate or otherwise. Thus, the mistrial was necessitated not by the actions of the State, but instead was granted by the trial court out of abundance of caution, after defense counsel objected to the giving of a curative instruction and insisted on a mistrial. As the trial court stated in its order, granting the mistrial actually benefitted Whatley, as it gave him the "opportunity to reassess his strategy at trial which had otherwise been compromised by his own [erroneous] assessment" of what evidence was available. Accordingly, because the mistrial was not caused by prosecutorial misconduct, we find no error in the trial court's decision to apply *Brewington* and calculate the relevant time period for Whatley's speedy trial claim beginning with the date on which Whatley filed his plea in bar. And because the delay between the filing of that motion and the trial court's ruling on the same was less than a year, the trial court correctly found that Whatley's speedy trial claim failed at the threshold. *Ruffin*, 285 Ga. at 55 (2).

17

For the reasons set forth above, we affirm both the trial court's order denying Whatley's plea in bar on double jeopardy grounds and the order denying his plea in bar based on an alleged violation of his constitutional right to a speedy trial.

*Judgment affirmed. Phipps, C. J., and Ellington, P. J., concur.*