Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
12/10/2021 08:08 AM CST

State of Nebraska, appellee, v.
Marcus L. Short, appellant.

___ N.W.2d ___

Filed September 17, 2021.    No. S-19-415.

1. **Judgments: Speedy Trial: Appeal and Error.** Generally, a trial court's determination as to whether charges should be dismissed on speedy trial grounds is a factual question which will be affirmed on appeal unless clearly erroneous.

2. **Pretrial Procedure: Appeal and Error.** Trial courts have broad discretion with respect to sanctions involving discovery procedures, and their rulings thereon will not be reversed in the absence of an abuse of discretion.

3. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress evidence based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

4. **Search Warrants: Affidavits: Probable Cause: Appeal and Error.** An appellate court reviews the trial court's findings as to whether the affidavit supporting the warrant contained falsehoods or omissions and whether those were made intentionally or with reckless disregard for the truth for clear error. An appellate court reviews de novo the determination that any alleged falsehoods or omissions were not necessary to the probable cause finding.

5. ____: ____: ____: ____. After-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review. Instead, a judge's determination of probable cause to issue a search warrant should be paid great deference by reviewing courts.

6. **Search and Seizure.** Application of the good faith exception to the exclusionary rule is a question of law.

7. **Constitutional Law: Speedy Trial.** The right to a speedy trial is unique from other rights enshrined in the U.S. Constitution for the protection of the accused because there is a societal interest in providing a speedy trial, which exists separate from, and at times in opposition to, the interests of the accused.

8. **Speedy Trial: Witnesses.** The deprivation of the right to a speedy trial may work to the accused's advantage when adverse witnesses become unavailable or their memories fade over time.

9. **Speedy Trial: Presumptions.** Until there is some delay that is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance in determining if the right to a speedy trial has been violated.

10. **Constitutional Law: Speedy Trial.** Counsel cannot seek and obtain continuances to give the defense more time to be ready for trial because of the government's dilatory behavior and then, after the fact, reverse course and claim that the indictment should be dismissed on the ground that the defendant's right to a speedy trial under the U.S. Constitution has been infringed because of that behavior.

11. **Speedy Trial.** A defendant cannot claim the loss of the fundamental right to a speedy trial through the inherent delays of a process the defendant has called upon—even if that process was to vindicate another fundamental right.

12. **Constitutional Law: Speedy Trial: New Trial: Appeal and Error.** Absent extraordinary circumstances, an appellate court does not consider the entire period of time beginning with the original charge or arrest in computing the length of the delay when there has been a mistrial. Instead, the constitutional speedy trial analysis focuses only on the period after the mandate for a new trial and the subsequent retrial.

13. **Speedy Trial.** Only misconduct involving deliberate delay tactics designed to circumvent the right to a speedy trial is an extraordinary circumstance warranting consideration of the period of delay before a mistrial.

14. **Constitutional Law: Speedy Trial: Presumptions.** A delay of a year or more is the benchmark commonly recognized as presumptively prejudicial in a constitutional speedy trial analysis.

15. **Speedy Trial: Verdicts: Sentences.** The more complex and serious the crime, the longer a delay might be tolerated, because society also has an interest in ensuring that longer sentences are rendered upon the most exact verdicts possible.

16. **Constitutional Law: Prosecuting Attorneys: Evidence.** A defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to the guilt of the defendant or relevant to the punishment to be imposed.

17. **Police Officers and Sheriffs: Prosecuting Attorneys: Evidence.** Police conduct resulting in suppression of favorable material evidence is imputed to the prosecution.

18. **Due Process: Motions for Continuance: Evidence.** There is no due process violation when the defendant has had an opportunity to request a continuance to adequately prepare the defense in light of evidence that, while disclosed late, is ultimately disclosed before the end of trial.

19. **Constitutional Law: Speedy Trial.** The Fifth Amendment has only a limited role to play in protecting against oppressive delay in the criminal context.

20. **Criminal Law: Pretrial Procedure.** Discovery in a criminal case is generally controlled by either a statute or a court rule.

21. **Criminal Law: Courts.** When a court sanctions the government in a criminal case for its failure to obey court orders, it must use the least severe sanction that will adequately punish the government and secure future compliance.

22. **Pretrial Procedure: Dismissal and Nonsuit.** Dismissal as a sanction for a discovery violation is only appropriate where less drastic alternatives are not available.

23. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

24. **Search Warrants: Affidavits: Probable Cause.** To determine whether a warrant was issued upon probable cause, a court generally limits its review to the four corners of the affidavit.

25. **Affidavits: Evidence.** An exception to the limitation of the court's review to the four corners of the affidavit is where the defendant makes a preliminary proffer of falsity warranting an evidentiary hearing.

26. **Affidavits: Probable Cause: Hearsay.** Probable cause may be founded upon hearsay as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily.

27. **Search Warrants: Affidavits: Probable Cause: Police Officers and Sheriffs: Presumptions: Proof.** While there is a presumption of validity with respect to the affidavit supporting the search warrant, that presumption may be overcome and a search warrant may be invalidated if the defendant proves the affiant officer knowingly and intentionally, or with reckless disregard for the truth, included in the affidavit false or misleading statements that were necessary, or material, to establishing probable cause.

28. **Search Warrants: Affidavits: Probable Cause.** Omissions in an affidavit used to obtain a search warrant are considered to be misleading when the facts contained in the omitted material tend to weaken or damage

the inferences which can logically be drawn from the facts as stated in the affidavit.

29. **Search Warrants: Probable Cause: Police Officers and Sheriffs: Evidence: Proof.** If the defendant successfully proves, by a preponderance of the evidence, that the police knowingly and intentionally, or with reckless disregard for the truth, included a false or misleading statement or omitted information material to a probable cause finding, then the court examines whether the evidence obtained from the warrant and search was fruit of the poisonous tree.

30. **Search and Seizure: Affidavits.** Mere negligence in preparing the affidavit will not lead to suppression, as the purpose of the exclusionary rule is to deter misconduct.

31. **Search Warrants: Affidavits: Probable Cause: Police Officers and Sheriffs.** Observations by fellow officers engaged in a common investigation are a reliable basis for a warrant, and probable cause is to be evaluated by the collective information of the police as reflected in the affidavit and is not limited to the firsthand knowledge of the officer who executes the affidavit.

32. **Search Warrants: Probable Cause: Words and Phrases.** Probable cause sufficient to justify issuance of a search warrant means a fair probability that contraband or evidence of a crime will be found in the item to be searched.

33. **Constitutional Law: Search Warrants: Probable Cause.** The Fourth Amendment's express requirement of particularity for a search warrant is closely related to its express requirement of probable cause.

34. **Search Warrants: Affidavits: Probable Cause.** A warrant affidavit must always set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of probable cause.

35. **Criminal Law: Search and Seizure: Evidence.** The nexus between the alleged crimes and the article to be searched does not need to be based on direct observation; it can be found in the type of crime, the nature of the evidence sought, and the normal inferences as to where such evidence may be found.

36. **Probable Cause: Police Officers and Sheriffs.** Probable cause may be based on commonsense conclusions about human behavior, and due weight should be given to inferences by law enforcement officers based on their experience and specialized training.

37. **Affidavits: Police Officers and Sheriffs.** Wholly conclusory statements by a law enforcement officer affiant that the affiant has reliable information and reason to believe evidence of a crime will be found in a particular place are insufficient.

38. **Constitutional Law: Probable Cause: Words and Phrases.** "Probable cause" is a term of art in Fourth Amendment jurisprudence that is defined as a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent people, not legal technicians, act.

39. **Search Warrants: Affidavits: Probable Cause.** The fundamental question in a challenge to an affidavit for lack of probable cause is whether, under the totality of the circumstances illustrated by the affidavit, the issuing magistrate had a substantial basis for finding that the affidavit established probable cause.

40. \_\_\_\_: \_\_\_\_: \_\_\_\_. The magistrate who is evaluating the probable cause question must make a practical, commonsense decision whether, given the totality of the circumstances set forth in the affidavit, including the veracity of and basis of knowledge of the persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

41. \_\_\_\_: \_\_\_\_: \_\_\_\_. Where the circumstances are detailed, where reasons for crediting the source of information is given, and where the magistrate has found probable cause to exist, the court should not invalidate the affidavit in a hypertechnical manner.

42. **Affidavits: Probable Cause.** Reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause.

43. **Probable Cause: Police Officers and Sheriffs.** Law enforcement cannot only rely on the general ubiquitous presence of cell phones in daily life, or an inference that friends or associates most often communicate by cell phone, as a substitute for particularized information to support probable cause that a specific device contains evidence of a crime.

44. \_\_\_\_: \_\_\_\_. To support probable cause, statements based on law enforcement expertise and experience must be accompanied by particular facts and circumstances such that, under the totality of the circumstances, including commonsense conclusions about human behavior, there is a substantial basis for concluding evidence of a crime will be found on the phone or phone information searched.

45. **Search Warrants: Probable Cause.** What will constitute sufficient particularized information to support probable cause that a cell phone or cell phone information searched will contain evidence of a crime depends upon the nature and circumstances of the crime and what is sought in the warrant.

46. **Criminal Law.** It can be generally recognized that cell phones tend to accompany their users everywhere, and thus, it may be inferred that a suspect's cell phone probably accompanied the suspect at the time of the crime.

47. **Search Warrants: Probable Cause: Affidavits.** A warrant may be considered so lacking in indicia of probable cause if the applicant files merely a bare bones affidavit, one which contains only wholly conclusory statements and presents essentially no evidence outside of such conclusory statements.

48. **Search and Seizure: Police Officers and Sheriffs.** To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter such conduct and sufficiently culpable that such deterrence is worth the price paid by the justice system, as exclusion serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.

49. **Search Warrants: Affidavits: Police Officers and Sheriffs: Probable Cause.** The good faith exception is applicable to an affidavit that fails to satisfy the substantial basis test to support probable cause, when police officers act in objectively reasonable good faith in reliance upon the warrant.

50. **Search Warrants.** A purpose of the particularity requirement for a search warrant is to prevent the issuance of warrants on loose, vague, or doubtful bases of fact.

51. **Constitutional Law: Search and Seizure: Search Warrants: Police Officers and Sheriffs.** The particularity requirement of the Fourth Amendment protects against open-ended warrants that leave the scope of the search to the discretion of the officer executing the warrant or permits seizure of items other than what is described.

52. **Constitutional Law: Search Warrants: Police Officers and Sheriffs.** To satisfy the particularity requirement of the Fourth Amendment, a warrant must be sufficiently definite to enable the searching officer to identify the property authorized to be seized.

53. **Search Warrants.** The degree of specificity required in a warrant depends on the circumstances of the case and on the type of items involved.

54. **Search Warrants: Probable Cause: Evidence.** A search warrant may be sufficiently particular even though it describes the items to be seized in broad or generic terms if the description is as particular as the supporting evidence will allow, but the broader the scope of a warrant, the stronger the evidentiary showing must be to establish probable cause.

55. **Search and Seizure: Search Warrants: Probable Cause.** A warrant for the search of the contents of a cell phone must be sufficiently limited in scope to allow a search of only that content that is related to the probable cause that justifies the search.

56. **Criminal Law: Police Officers and Sheriffs: Evidence.** Officers cannot predict where evidence of a crime will be located in a cell phone

or call records or in what format, such as texts, videos, photographs, emails, or applications.

57. ____: ____: ____. There is no way for law enforcement to know where in the digital information associated with cell phones it will find evidence of the specified crime.

58. **Constitutional Law: Search Warrants.** The most important constraint in preventing unconstitutional exploratory rummaging is that the warrant limit the search to evidence of a specific crime, ordinarily within a specific time period, rather than allowing a fishing expedition for all criminal activity.

59. **Constitutional Law: Search and Seizure.** A brief examination of all electronic data associated with a cell phone is usually necessary in order to find where the information to be seized is located, and sucn examination is reasonable under the Fourth Amendment.

60. **Constitutional Law: Warrantless Searches: Search and Seizure.** Warrantless searches and seizures are per se unreasonable under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions, which must be strictly confined by their justifications.

61. **Constitutional Law: Arrests: Search and Seizure.** In the case of a lawful custodial arrest, a full search of a person is not only an exception to the Fourth Amendment's warrant requirement, but is also a reasonable search under that amendment.

62. **Arrests: Search and Seizure: Probable Cause.** A search incident to an arrest can be made before an arrest as long as probable cause for the arrest exists before the search.

63. ____: ____: ____. It does not matter that a defendant is not formally placed under arrest until after a search, so long as the fruits of the search are not necessary to support probable cause to arrest.

64. **Warrantless Searches: Probable Cause: Police Officers and Sheriffs.** Probable cause to support a warrantless arrest exists only if law enforcement has knowledge at the time of the arrest, based on information that is reasonably trustworthy under the circumstances, which would cause a reasonably cautious person to believe that a suspect has committed or is committing a crime.

65. **Arrests: Probable Cause: Police Officers and Sheriffs.** Under the collective knowledge doctrine, the existence of probable cause justifying a warrantless arrest is tested by the collective information possessed by all the officers engaged in a common investigation.

Appeal from the District Court for Douglas County: Horacio J. Wheelock, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, for appellant.

Douglas J. Peterson, Attorney General, and Stacy M. Foust for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Freudenberg, J.

## I. INTRODUCTION

The defendant challenges the district court's denial of a motion to dismiss with prejudice or for absolute discharge based on late disclosures of discovery information resulting in delays the defendant argues implicated his speedy trial rights. The defendant also challenges the admission of evidence at trial obtained from the searches of his residence, cell phones, call records, and cell site location information on the ground that the searches violated his Fourth Amendment rights. Specifically, the defendant asserts that the seizure of his cell phones was pursuant to an unlawful arrest and the information contained thereon would not have been inevitably discovered; the warrant for the search of his residence was based on an affidavit containing falsities and material omissions; the warrants for the searches of his cell phones, call records, and cell site location information were supported by affidavits that failed to support probable cause; and the warrants for the searches of his cell phones, call records, and cell site location information lacked particularity. We affirm.

## II. BACKGROUND

Marcus L. Short's convictions stem from three separate incidents that were tried together in two trials after the first trial resulted in a mistrial. Following a retrial, Short was convicted of murder in the first degree, a Class IA felony; use of a firearm to commit a felony, a Class IC felony; and two counts of possession of a firearm by a prohibited person, each a Class ID felony, in relation to the death of Garion Johnson.

Short was acquitted on the murder charge relating to the death of Deprecia Neelon and the accompanying use of a firearm to commit a felony charge. Short was sentenced to life imprisonment for Johnson's murder and 49 to 50 years' imprisonment on each of the other convictions to be served consecutively with the life sentence.

## 1. Shootings

The charges stemmed from three separate shootings on separate days, August 5, 6, and 8, 2015, suspected to be perpetrated by Short, Preston Pope, and Shadow Harlan. Neelon was killed on August 6. Johnson was suspected to be the target in all three shootings and was ultimately killed on August 8. Johnson was Neelon's boyfriend's cousin.

### (a) August 5, 2015

At approximately 6:35 p.m. on August 5, 2015, Johnson was sitting in a white Chevy Impala outside of Neelon's residence when an individual walked up and fired a gun at him. Johnson was able to run away as the shooter chased him. One .45-caliber spent shell casing and a tennis shoe were recovered at the scene. Two witnesses identified a photograph of Pope as the shooter.

### (b) August 6, 2015

In the early evening hours on August 6, 2015, someone intentionally set the outside of Neelon's residence on fire. While Neelon was outside investigating and attempting to put the fire out, she was shot seven times and died at the scene.

That same night, an anonymous tip came in regarding a person named "Shadow" telling people that he had been involved in a shooting a few blocks away. Officers responded to the address provided in the tip, which was a couple blocks from the Neelon residence, and apprehended Harlan as he tried to flee from the residence. Harlan matched witnesses' descriptions of the shooter and was wearing the same clothes described by witnesses when he was apprehended.

Witnesses observed multiple individuals quickly leave the area after the Neelon shooting in two separate vehicles: an older blue van and a white sedan. Officers later located and attempted a traffic stop of a van matching the description on August 14, 2015. Pope fled the traffic stop and was later arrested in the area where the van was located. The van was registered to Pope's mother, but she told officers that Pope used it.

Evidence recovered at the Neelon residence included a black knit glove and three .45-caliber spent shell casings. A pricetag from a pair of jersey gloves was found in the alley about a block away from the Neelon residence.

A fingerprint lifted from the pricetag was matched to Short. Further DNA testing also revealed that Short could not be excluded as a partial profile contributor to DNA found on the inside of the glove.

### (c) August 8, 2015

Johnson was at the residence of his girlfriend, Mikayla Finley, on Fontenelle Boulevard on the morning of August 8, 2015. Finley told officers that she told Johnson to move her white Chevy Impala into the garage. When Johnson was outside moving the Impala into the garage, Finley heard noises she believed were gunshots. Johnson reversed the vehicle, circled through neighboring yards, and crashed into the garage of a nearby residence, all while shots were being fired at the Impala.

Finley told officers that she saw two males standing around her Impala and that one made eye contact with her. She provided a general description of him to police, but was unable to identify anyone when she was presented with a photographic lineup that day.

Witnesses, including Finley, described the shooters. Both wore dark clothing, and one was described as a Black male, in his late teens, approximately 5 feet 8 inches tall, and dressed in a black hoodie or a black hoodie with a red "N" on it.

A witness reported a suspicious white Monte Carlo with white and blue dealership plates parked in the area that morning on 41st Street. Another witness reported seeing two Black males dressed in black hoodies and black sweatpants walking fast through yards, from the direction of where he heard gunshots and a crash, and subsequently heading south on 41st Street. Seconds later, this witness saw what appeared to be a white Monte Carlo speed north on 41st Street. A police detective lived in that area, and video surveillance from his house showed a white Chevy Monte Carlo that traveled south on Fontenelle Boulevard at 9:48 a.m.

Evidence recovered from the scene included four .45-caliber spent shell casings. Law enforcement believed the shooting was related to the August 5 and 6, 2015, shootings.

Detectives were provided the description of the white Chevy Monte Carlo and Short's name, whose fingerprint matched the fingerprint found on the pricetag near the Neelon residence. At 1:31 p.m., law enforcement arrived at Short's last known address at 4268 Binney Street. There they discovered, parked in the driveway, a white Chevy Monte Carlo with white and blue "paper plates" and in-transits for "M.S." in the window.

### 2. SEARCH OF SHORT'S RESIDENCE

Det. Ryan Hinsley drafted an affidavit for a search warrant of 4268 Binney Street, and he joined law enforcement already at the residence at 4:17 p.m. on August 8, 2015, with the signed search warrant.

### (a) Affidavit

In the affidavit for the search warrant, Hinsley stated officers had just and reasonable grounds to believe that certain types of property would be found at 4268 Binney Street and requested permission to seize items from the house and from the Monte Carlo in the driveway, as well as the ability to process any areas that may contain a DNA profile or fingerprints.

Items of interest to be seized included venue items identifying those parties either who owned or who were in

control of the residence and the white Chevy Monte Carlo with in-transits and dealer paper plates; firearms; ammunition; any companion equipment for firearms; cell phones; computers; audio and video equipment; storage media; and "[a]ny and all clothing or property believed to have been worn and/or used during the commission of the assault, to include, but not limited to a black hoodie with a red 'N' on it along with a black bandana with white design and a red bandana."

Pertaining to the just and reasonable grounds for believing such evidence would be found at the residence, the affidavit described:

> On Tuesday, August 4, 2015, Omaha Police Department Officers received a radio call to [the Neelon residence] for an attempted felony assault. The victim was identified as JOHNSON, Garion [date of birth] 06/. . ./1996 who was uncooperative at the time.
>
> On Wednesday, August 5, 2015, Omaha Police Department Officers received a radio call to [the Neelon residence] for a shooting. The victim in that incident later died from her injuries. During that investigation, Omaha Police Department Crime lab recovered a glove from the scene and from that glove obtained a fingerprint that was found to belong to Marcus SHORT [date of birth] 10/. . ./89.

The affidavit further described:

> On Saturday, August 8, 2015, at 0949 hours officers of the Omaha Police Department were called to [a specific address on] Fontonelle [sic] Boulevard, Omaha, NE in regards to a shooting. Upon arrival officers located the victim (later identified as Garion JOHNSON, date of birth 06/. . ./1996) inside the driver's seat of a white 2007 Chevy Impala . . . . JOHNSON had been shot several times throughout his body and was transported from the scene by medics to Creighton Health Initiative (CHI) Hospital where he later succumbed to his injuries.

It was later elicited through testimony that the dates in the affidavit of the prior incidents were incorrect and that it was actually August 6, 2015, that the Neelon homicide occurred.

The affidavit further described Finley's statements to the investigating officers:

Officers located JOHNSON's girlfriend (Mikayla FINLEY, date of birth 4/. . ./1990) . . . . FINLEY stated she then heard a series of muffled banging noises coming from the garage area which she believed were gun shots. FINLEY advised she looked out the front window of the residence and saw two unknown males standing around her Impala and JOHNSON in the front seat attempting to back out of the driveway. FINLEY stated one of the males made eye contact with her and was described as a [B]lack male, 16-18 years old, 5′8-5′10, 140-160 pounds, wearing a black hoodie with a red "N" on the front [of] it.

The affidavit stated what other witnesses on the scene of the Johnson homicide on August 8, 2015, reported to law enforcement:

[Another witness] was also located at the scene and brought to OPD Central for an interview. [She] advised she saw one [B]lack male wearing all black clothing (hoodie) and a bandana covering his face shooting with his right hand at the white Chevy Impala. [The witness] advised the Impala then drove through her front yard try-ing to flee from the shooter and crashed into a house a few house[s] down from the originating house.

. . . Additionally, witnesses stated after the shooting two [B]lack males were seen running through yards and got into a white Chevy Monte Carlo parked towards the west, which then fled from the area westbound on Font[e]nelle Boulevard with paper plates.

Finally, the affidavit described how the investigation on August 8, 2015, progressed to 4268 Binney Street:

On Saturday, August 8, 2015, members of the Omaha Police Department later located a White Chevy Monte Carlo with In-Transits and paper plates parked in front of 4268 Binney Street. At that location, Officers also located a party identified as Marcus SHORT [date of birth] 10/. . ./89.

### (b) Fruits of Search

Officers in their search discovered two firearms in Short's bedroom at his residence, a .45-caliber Glock handgun and a .357-caliber Smith & Wesson revolver. In addition to the two firearms, officers seized or took photographs of several other items found at the house, including a muddy pair of black pants, two black hoodie sweatshirts, muddy shoes, and two pairs of black gloves. The officers also seized as venue items a cell phone receipt on which Short's name and a phone number with a 702 area code appeared, as well as a form from the Douglas County public defender's office regarding Short's representation in a misdemeanor matter identifying Short as a client with his contact information including his 4268 Binney Street address and the phone number with the 702 area code.

### 3. Seizure of Cell Phones

Short was not initially at 4268 Binney Street at the time law enforcement arrived, but agreed to Det. Candace Phillips' request that he return to his residence. Officers, including Phillips, met Short at the perimeter of the crime scene upon his arrival, approximately three houses away from his residence.

Officers handcuffed Short and placed him in a police cruiser. They seized two cell phones and a set of keys from his person. At some point, Short was released from the handcuffs and given his phones back, but after some disagreement between law enforcement officers, Short was placed back in handcuffs and his phones were seized again. Short was then transported to the Omaha Police Department (OPD) where he was held in an interview room and interviewed by Det. Eugene Watson and another detective. It was approximately 3 hours after being

transported to OPD, while Short was being interviewed, that law enforcement found the two firearms at Short's residence. Upon that discovery, Short was formally arrested on two counts of possession of a firearm by a prohibited person.

### 4. Search of Content of Cell Phones

On August 11, 2015, officers obtained a warrant to search Short's cell phones that they had seized from Short's person on August 8, which were an LG model LG237c flip-style phone (LG flip phone) and an LG model LS740 phone (LG smart phone).

### (a) Affidavit

The affidavit for the search warrant included the information that (1) witnesses to the Johnson homicide described a suspect vehicle fleeing the area after the shooting as being a white Chevy Monte Carlo with no license plates, displaying in-transits and dealer paper plates; (2) the suspect vehicle was located in the area of 42d and Binney Streets; (3) Short was identified as the owner of the vehicle; (4) Short was located on August 8, 2015, and transported to OPD to be interviewed; and (5) Short had the LG flip phone and the LG smart phone in his possession, which were booked into evidence.

Further, the affidavit stated:

Affiant Officer knows, through training and experience, that persons use cellular telephones to communicate. This includes . . . persons planning a crime, committing a crime and/or trying to regroup after committing a crime. These communications can be in the form of telephone calls, emails and/or messages. People are also know[n] to contact parties using cellular telephones via telephone calls, emails of messages and threaten physical harm to others.

Affiant Officer knows, through training and experience, that persons who engage in criminal acts will sometimes take video of the act, video before committing the crime and/or after the crime was committed. Persons are

also known to pose with weapons and take photographs of themselves and others displaying weapons.

The affidavit requested to search specific categories of data on the cell phones and specified what each of those categories could reveal with regard to a criminal investigation, which the search warrant used and restated as the areas authorized to be searched.

### (b) Warrant

The search warrant authorized a search of the LG flip phone and the LG smart phone in relation to the homicide of Johnson and allowed officers to obtain from the cell phones the following: (1) phone information and configurations; (2) user account information; (3) call logs; (4) contact lists; (5) short and multimedia messaging service messages; (6) chat and instant messages; (7) email messages; (8) installed applications and their corresponding data; (9) media files such as images, videos, audio, and document files; (10) internet browsing history, including bookmarks, "browser cookies," and associated cache files; (11) cell tower connections, global positioning system fixes, waypoints, routes, and tracks; (12) WiFi, Bluetooth, and synchronization connection history; (13) memos and notes; (14) user dictionary information; and (15) calendar information. The warrant further stated:

> Affiant Officer or their agents may be required to examine every file and scan its contents briefly to determine whether it falls within the scope of the warrant. This is necessary as it is difficult to know prior to the search the level of the technical ability of the device's user and data can be hidden, moved, encoded or mislabeled to evade detection.

### (c) Fruits of Search

Pursuant to this search, police determined that the phone number for the LG flip phone was 402-619-2962. Since this was only a flip phone without capabilities to take screenshots, the officer who examined the phone took photographs of

the screen and those photographs were entered into evidence. The photographs of the LG flip phone's content included several text messages and phone calls between this phone and Pope's phone.

The LG smart phone had a "SIM" card, which usually contains only the subscriber number and phone number of the device. This card was removed from the phone and put into a reader to read the content on the card, and the number associated with the phone was discovered to be 702-619-1025.

The LG smart phone itself was "locked," and OPD did not have the capabilities in 2015 to take data from a locked phone. The LG smart phone was sent to a computer crime institute that used a computer program to read the data chip of the phone and then returned a readable report of its findings. The data of the LG smart phone showed several contacts, including incoming and outgoing phone calls and text messages between the LG smart phone and Pope's phone (contacts with "Playboi") and contacts with "Shadow," perceived to be Harlan. The phone also showed that Short visited websites for news articles about the homicides.

### 5. Search of Call Records With Cell Site Location Information

On August 11, 2015, a warrant was issued for information from a cell phone service provider in regard to the phone number 702-619-1025 (Short's LG smart phone) and a number of another cell phone unrelated to Short's appeal. An identical warrant was issued for information from another cell phone service provider in regard to the phone number 402-619-2962 (Short's LG flip phone) and two other numbers unrelated to Short's appeal. A new warrant was obtained on December 5, 2018, for the search of call records and cell site location information for the LG smart phone, after the court's ruling that Short's statements as to his phone numbers, relied upon in the original warrant, were obtained as a fruit of an unlawful arrest and in violation of Short's *Miranda* rights and Short's right to counsel. The court determined the December 2018 search

warrant was independent of the tainted evidence because police obtained the same phone number associated with Short while executing a valid search warrant at Short's residence. No explanation was offered as to why Short's LG flip phone was not included in the 2018 warrant, since the phone number for that phone was found during the search of the physical phone pursuant to a valid search warrant discussed above. Only the December 5 warrant is at issue in this appeal.

### (a) Warrant

The search warrant authorized officers to obtain customer or subscriber information for the LG smart phone with the phone number 702-619-1025 for the July 8 to August 10, 2015, time period. It also authorized "[a]ll records and other information relating to" that number and time period, including (1) the records of user activity for any connections made to or from the account, including the date, time, length, and method of connections, data transfer volume, user name, and source and destination of internet protocol addresses; (2) all available toll records to include call detail, "SMS detail, data sessions, per call measurement data (PCMD), round trip time (RTT), NELOS, cell site and cell site sector information and cellular network identifying information"; (3) the noncontent information associated with the contents of any communication or file stored by or for the accounts, such as the source and destination email addresses and internet protocol addresses; (4) the correspondence and notes of records related to the accounts; and (5) the current cellular site list, in electronic format, which includes any and all markets, switches, and areas the target phone utilized during the time period above.

### (b) Affidavit

In support of the December 2018 warrant, the affidavit indicated the grounds for issuance of the search warrant included the following: (1) witnesses after the Johnson homicide stated that two Black males were seen running through yards and that they then got into a white Chevy Monte Carlo

with in-transits and dealer paper plates, (2) the suspect vehicle was located in the area of 42d and Binney Streets, and (3) the owner of the vehicle was identified as Short.

With regard to how the police came to determine Short's phone number, the affidavit stated:

On Saturday, August 8th 201[5], Omaha Police Homicide Detectives Wendi DYE . . . and Ryan HINSLEY . . . served a court ordered search warrant at 4268 Binney Street, Omaha, Nebraska, Douglas County [Short's residence]. Through the course of the investigation it was determined that suspect Marcus SHORT . . . resided at this residen[ce]. Items of venue with Marcus SHORT's name were located in the residence in the upstairs/attic bedroom.

Item #12 document bearing Marcus SHORT's name was found in the trash in the bedroom. The document was issued from the Douglas County Public Defender's Office containing the following information:

Client Name: SHORT, Marcus
Address: 4268 Binney Street Omaha, Ne 68111
Telephone Number: 702-619-1025
Date of Birth: 10/. . ./1989
Charges: Paraphernalia and Resisting

A second receipt from [a cell phone provider] with Customer Name: Marcus Short phone number 702-619-1025 dated 8/2/2015 1:41:58 pm was also located in the bedroom of Marcus SHORT.

Affiant Officer believes through the receipts, Marcus Short was using the phone number 702-619-1025 to communicate with others.

Regarding the need for the records for the investigation, the affidavit stated:

Affiant Officer believes that if she is granted this Search Warrant the information received from the carrier would help to identify other witnesses and suspects to the crime under investigation. The information gained would also

help officers determine the locations of the cellular telephone devices used and thus the persons using those telephone numbers. This information would help to prove or disprove statements of witnesses and/or suspects.

Affiant Officer is requesting the time period listed above to determine a pattern of behavior for the target(s) both before and after the crime under investigation.

From training, experience and research Affiant Officer is aware that the data stored by cellular network providers can provide invaluable insight for criminal investigations. . . . In addition to personal use, cell phones are often used as tools in criminal activity. Affiant Officer is aware of numerous instances where cell phones were used by participants in crimes to communicate via voice and text messaging. Affiant Officer is also aware of instances where the cell phone was operating in the background, accessing the cell provider's network, and generating location based data. When a cell phone interacts with the cellular provider's network, it leaves records that allow for the identification of locations where the cell phone accessed the network. These interactions between the cell phone and the network can be created intentionally or accidentally by the user, or automatically by the device itself as part of its regular functioning.

The affidavit further explained how each of the categories of information requested from the cell phone service providers could be "invaluable tools" when conducting a criminal investigation such as assisting in identifying or confirming the owner of a cell phone; constructing a timeline of events regarding an investigation; establishing communications between parties to identify coconspirators, witnesses, or victims; establishing the proximity of a location of the cell phone to demonstrate that the device, and its user, was in a location associated with an incident; and providing insight into an individual's level of culpability and knowledge regarding an investigated incident.

### (c) Fruits of Search

The records received were sent to the Federal Bureau of Investigation for assistance. There, a special agent used the call records provided by the two cell phone service providers to map out the cell towers being used during the activity of Pope's phone and Short's LG smart phone on August 5, 6, and 8, 2015, and to give an approximate location of the cell phones on those dates. Using the call detail record with cell site information that identifies which switch, cell tower, and cell face sector of that tower that the cell phone used when it made a call, the special agent was able to determine that Short's LG smart phone made six calls between 5:30 and 7:30 p.m. on August 5 and was not in the area of the Neelon residence when these calls were made. Pope's phone made eight calls between 5:30 and 6:59 p.m. on August 5 while Pope's phone location progressed north and was within the footprint of the tower that covers the area of the Neelon residence by the time of the phone call at 6:26 p.m. On August 6, between 7:30 and 9:07 p.m., Short's LG smart phone was not in the footprint of the tower that covers the Neelon residence, but Pope's phone was. On August 8, focusing on the Johnson homicide crime scene on Fontenelle Boulevard, the special agent determined that between 6 and 8 a.m., Short's LG smart phone was in the area of his residence and then moved to the area of the Johnson crime scene for phone calls made between 8 and 10 a.m. Pope's phone was also in the area of the Johnson crime scene on August 8 between 8 and 10 a.m. and was later in the area of Short's residence between 10 and 11 a.m.

### 6. Discovery Delays and Motions to Continue Occurring Before Mistrial

#### (a) Short's October 4, 2016, Motion to Compel Discovery

On October 4, 2016, defense counsel moved to compel discovery the prosecution had failed to disclose in accordance with a court order issued approximately 4 months before. In

the motion, Short requested an order compelling the State to provide the DNA results of the clothing tested; the fingerprint analysis notes and reports for the glove found; the cell tower data, reports, and notes for the LG flip phone and the LG smart phone; the call and text history for the "white Iphone" and the "black Sprint" phone seized; all reports for multiple case files; and all photographs shown to Johnson's girlfriend, Finley, on August 8 and 10, 2015. The State explained at a hearing on the motion that it was expediting disclosure of discovery materials the best it could. No order resulted directly from the October 4 motion to compel.

### (b) Short's December 12, 2016, Motion to Continue

On December 12, 2016, counsel for Short filed a motion to continue the trial on several grounds, including significant delays in the receipt of discovery materials. The court granted the motion to continue. It reset trial for May 15, 2017, stating in the order that the "speedy trial clock is stopped" until then.

### (c) Short's May 3, 2017, Motion to Continue

After the State filed a motion for leave to endorse Marcela Mitchell as a witness on May 2, 2017, Short filed a motion on May 3 to continue trial based on the late disclosure on May 2 of the OPD report that included Mitchell's identification of Pope from a photographic spread. Phillips admitted that Mitchell identified Pope as an individual who attempted to shoot Johnson on August 5, 2015, but Phillips had failed to dictate a police report regarding this identification until March 9, 2017. The court granted Short's motion to continue and reset trial to begin on October 16. The court again stated in its order that the "speedy trial clock is stopped" until then.

The Douglas County public defender's office was appointed to represent Short as new counsel on June 27, 2017. On July 5, the new counsel orally requested the court to continue the

October 16 trial date, which oral motion the court sustained. A new trial date was set for March 19, 2018.

### (d) Short's Motion for Additional Discovery

On November 14, 2017, Short filed a motion for additional discovery, requesting a copy of the "Homicide Lead Sheet" maintained by the OPD homicide unit for the Johnson homicide and the Neelon homicide. This motion was granted by the court on November 27 in an ongoing manner, such that the State was ordered to provide continuous updates if information was added to the lead sheets.

### (e) Motion to Dismiss or Motion for Complete Discharge

Short's case was originally consolidated with the case against Pope, but after Short's motion to sever trials with Pope was granted and Pope's trial was set to go first, on March 19, 2018, Short's trial was ordered to commence April 30. On April 13, Short filed a motion to dismiss all charges or, in the alternative, for a complete discharge. The motion relied on the constitutional rights to due process and a speedy trial, as well as Neb. Rev. Stat. § 29-1919 (Reissue 2016) regarding discovery sanctions.

The motion outlined the discovery motions, orders, and continuances described above. Short noted that discovery continued to be provided, with the most recent material received on April 11, 2018. Short asserted that the untimely receipt of discovery materials was due to a "continuing pattern of gross misconduct and mis-management by [OPD]." Short asserted that his ability to prepare to defend these cases at trial had been severely impeded.

Short argued that with trial scheduled to commence on April 30, 2018, it would be highly unlikely the defense would be able to locate witnesses in so short a time period between disclosure of the witnesses' statements and the commencement of trial. But Short did not seek another continuance. Short pointed out that trial had already been continued on

two previous occasions due to late disclosure of discovery materials and explained that he was put in a place to either "request[] another continuance or proceed[] to trial without sufficient time to locate, interview, depose, and call as witnesses at trial, those witnesses who could provide exculpatory evidence at trial." Short argued that "due to the State's continuing inability and failure to comply with its discovery obligations and requirements, the State has violated Short's right to a speedy trial."

Short asked the court to dismiss with prejudice all charges against him or, in the alternative, to grant "complete discharge" of all charges, because, due to the misconduct of OPD, it was impossible for Short to receive a fair trial. Further, Short argued that OPD's misconduct in failing to manage and disclose evidence and discovery materials was imputed to the prosecution, so the prosecution should be held responsible for such misconduct.

### (i) Evidence Presented at Hearing on Motion

An evidentiary hearing on Short's motion to dismiss or for complete discharge was held on April 16, 18, and 19, 2018.

Phillips and Watson testified at the hearing. They were both assigned to the Neelon homicide investigation team. The detectives assigned to the Johnson homicide all completed their police reports in a timely manner.

Phillips and Watson admitted that on multiple occasions during the Neelon homicide investigation, years elapsed between conducting an interview and the generation of any police report on that interview. They agreed this was not standard operating procedure for a homicide detective. Phillips admitted that she had failed to complete reports in a timely manner in other cases, which resulted in a mistrial because of the late disclosure of police reports. As a result of the publicity regarding this case and the pattern of delays in writing reports, Watson was removed from the homicide unit.

Other sergeants and detectives with experience in the homicide unit at OPD testified that a detective is expected to

promptly book the original disc of an interview into evidence at the property room and that the time for completing a report on an interview can vary between 2 weeks and 6 months depending on the workload of the detective and the priority of the case. Several detectives testified that they were able to work overtime hours to complete reports and, in their opinion, taking more than a year to complete a report is not acceptable and would be poor practice.

Watson testified his delays were because of the workload and having to prioritize active cases. He also testified that he had experienced personal issues, such as heart failure, and that his case materials were "all on hold" during his medical leave in 2017. Because of these distractions and his workload, he had forgotten about interviews and misplaced discs. Phillips testified that her delays were because of the workload and because of prioritizing cases where an arrest had been made.

The Douglas County Attorney testified at the hearing that his office has an "open file policy" regarding discovery, whereby his office sends defense counsel copies of all evidence provided by law enforcement agencies and other sources as soon as possible, and that his office relies on OPD to notify it when OPD receives more evidence. He testified that he was aware of multiple occasions where two detectives, Phillips and Watson, failed to provide evidence and properly turn over evidence in a timely manner, resulting in one or more mistrials in the past. The Douglas County Attorney testified that he informed the command staff at OPD of the ongoing concerns with Phillips and Watson, but that ultimately, he had no authority over OPD.

*(ii) Order Denying Motion*

On April 26, 2018, the court denied Short's motion to dismiss or, in the alternative, for complete discharge. The court acknowledged the above dates and procedure on how the motion came to be and that "[d]iscovery continues to be provided and material was provided at least as late as April 11, 2018."

a. Speedy Trial

In examining whether Short's constitutional right to a speedy trial was violated, the court separated the Johnson homicide from the Neelon homicide because of the different OPD homicide teams assigned to each homicide. The court found no constitutional speedy trial violations attributable to the Johnson homicide investigation because the homicide team that was assigned to that homicide investigated in a timely and efficient manner, and no discovery violation was attributed to their investigation. Accordingly, the court concluded that Short's motion to dismiss or motion for complete discharge, as it related to the Johnson homicide, was overruled.

In analyzing the Neelon homicide, the court used factors laid out in *Barker v. Wingo*[1] to determine whether Short was deprived of his constitutional right to a speedy trial: (1) the length of the delay, (2) the reason for the delay, (3) whether and when the defendant asserted his speedy trial right, and (4) whether the defendant was prejudiced by the delay. The court concluded the length of the delay was approximately 10 months.

The court noted that the three prior continuances in this case were on Short's motions in December 2016, May 2017, and June 2017. Then, upon severance of the trials for Short and Pope, Short's trial was set for April 30, 2018. After each motion to continue was sustained, Short engaged in extensive pretrial litigation, and as of the date of the order, several defense motions in limine and a motion to suppress were set for hearing on April 27. The court acknowledged that there was no evidence that the State deliberately attempted to delay the trial. The court found that Short did not make a viable showing that his defense of the Neelon homicide was prejudiced due to unavailable witnesses that would have been available at a more timely trial, nor that the witnesses were unable to accurately recall past events because of any delay. For all

---

[1] *Barker v. Wingo*, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972).

these reasons, the court found there was not a violation in the Neelon homicide of Short's right to a speedy trial.

### b. Due Process

In rejecting Short's argument that alleged due process violations called for the dismissal of all criminal charges with prejudice, the court found that "the conduct of Detective Phillips and Detective Watson, the lack of oversight by OPD, and the actions of the County Attorney's Office [did] not indicate bad faith." The court acknowledged that the evidence showed a pattern of failure to follow best practices and procedures, but did not show any deliberate attempt to gain an unfair tactical advantage, official animus, or a conscious effort to suppress exculpatory evidence. Thus, the evidence did not warrant the severe sanction of the dismissal of charges.

### c. Statutory Violations

Finally, the court addressed the alleged statutory discovery violations. The court acknowledged that Nebraska has not specifically addressed what factors a court should consider when asked to dismiss an information because of a discovery violation in a criminal case.

When looking at outside jurisdictions, the court acknowledged the preferred sanction is a continuance. The court noted that the Eighth Circuit Court of Appeals has held that the relevant factors in determining an appropriate sanction for a discovery violation are "'the reasons for the government's delay and whether it acted intentionally or in bad faith; the degree of prejudice, if any, suffered by the defendant; and whether any less severe sanction will remedy the prejudice and the wrongdoing of the government.'"[2]

The court reiterated that the evidence did not show Phillips or Watson acted in bad faith or with the intent to mislead, deceive, or act with a sinister motive in not completing

---

[2] *U.S. v. Davis*, 244 F.3d 666 (8th Cir. 2001).

their reports in a timely manner; the State did not act in bad faith; and any prejudice to Short's preparation for trial as a result of the delays could be cured with a continuance. Based on the finding that there was no bad faith on the part of the State, the court decided to impose the least severe sanction that would accomplish prompt and full compliance with the discovery order, "which [was to allow] Short a continuance should he request one."

### 7. JURY SELECTION AND MISTRIAL

Short did not request a continuance, and jury selection for his first trial proceeded as scheduled on April 30, 2018. Upon motions from both parties, a mistrial was declared on May 8 due to improper jury contact by an unauthorized third party associated with Short. Retrial was scheduled to commence on January 7, 2019. The order scheduling retrial for January 7 indicated that this was set by agreement of the parties.

### 8. RETRIAL AFTER MISTRIAL

Following the mistrial, Short did not renew his motion to dismiss or, in the alternative, for absolute discharge based on discovery violations. Short's retrial commenced as scheduled on January 7, 2019. At trial, Short made several objections relevant to this appeal. The court did not generally adopt its rulings from the aborted trial, but referred to the hearings and rulings on motions to suppress when Short objected to the same evidence at the retrial.

### (a) Seizure of Cell Phones and Search of Residence

Short objected at trial to the admission of all evidence stemming from his allegedly unlawful de facto arrest when he was handcuffed and placed in the police cruiser and concurrent unlawful seizure of his cell phones, and he objected to all evidence stemming from the search of his residence, which he asserted was pursuant to a false and misleading affidavit.

These two objections purportedly encompassed all evidence from the search of the physical phones, his call records, and the cell site location information, as well as the physical evidence seized at his residence.

The court overruled the motion regarding the seizure of the phones, reasoning the phones would have inevitably been discovered when Short was lawfully arrested after discovery of the firearms at Short's residence. The court reiterated its prior ruling before the mistrial that the phones had been unlawfully seized during a de facto arrest without probable cause, but that the inevitable discovery doctrine exception still allowed the seizure of the phones.

The court also overruled the objection relating to the affidavit in support of the search of Short's residence, which, as relevant to this appeal, focused on the statements that Short's fingerprints were found on the glove, that "witnesses stated after the shooting two [B]lack males were seen running through yards and got into a white Chevy Monte Carlo," and that Short was located at 4268 Binney Street, as well as the omission of Finley's inability to identify Short as the shooter in a photographic spread. The court found that after striking the disputed portions of the affidavit and including the omitted information, the affidavit was still sufficient to establish probable cause to search Short's residence. Alternatively, the court reiterated its findings that the evidence at hearings on Short's motion to suppress, held before the mistrial, demonstrated that any false statements or omissions were not intentional or in reckless disregard for the truth.

Hinsley had testified that he based the affidavit on information he obtained from his interview of Finley and information relayed to him by Sgt. Danette Culler, Phillips, and Watson, who were all at the scene. Hinsley testified that he believed the pricetag and the glove were the same evidence until he learned his mistake shortly before the hearing. Hinsley explained he had written the affidavit as he talked on the phone with Culler and had no reason to question or clarify the information

Culler was telling him. Culler denied that she told Hinsley that Short's fingerprint was taken from the glove found at the scene, and she testified that she recalled discussing with Hinsley a pricetag that was found that contained a fingerprint match for Short.

The evidence at the hearings also demonstrated that officers canvassing the area spoke with several witnesses related to the Johnson homicide and that some witnesses saw two Black males leaving the scene while other witnesses saw only one Black male leaving the scene. An officer testified that he canvassed the area near the Johnson homicide scene, talked to multiple witnesses, and relayed the information to the on-duty sergeant who was relaying it to homicide detectives. The officer testified that there was not any one witness that saw both the shooting and a suspect or suspects get into the white Monte Carlo. The officer further testified that some witnesses claimed to have seen all or parts of the shooting and that there were other witnesses who had information about the white Monte Carlo, but no idea about the shooting. Hinsley testified that he named only two witnesses in the affidavit as witnesses personally interviewed by him or another detective at OPD and that he was not provided specific names of the other witnesses, but he relayed a conglomeration of information provided by a number of people from the uniformed officers and detectives at the scene that was relayed to him through Culler.

The evidence at the hearings demonstrated Short was not located at 4268 Binney Street, but was actually located walking toward 4268 Binney Street, inside the crime scene perimeter tape, three or four houses away.

Evidence showed that Finley failed to identify Short as the shooter when shown a photograph of him and that the affidavit omitted specific interviews with witnesses who observed only one male firing into the car. Hinsley testified that he had "no good reason" for not including the information that Finley did not identify Short as the shooter that she saw and described to law enforcement.

The court found that Hinsley's and Culler's testimonies were truthful and credible and that the evidence was insufficient to prove that Hinsley intentionally misled the court or acted in reckless disregard for the truth in preparing the affidavit. The court found that the averment in the affidavit regarding Short's fingerprint being found on a glove rather than the pricetag for the glove near the Neelon residence was due to mistake or simple negligence not rising to perjury or reckless disregard for the truth. The court further found that the averment of where Short was arrested being "at the location" of 4268 Binney Street, rather than approximately three houses away after he had crossed the taped crime scene area, was "insignificant." The court found that the averment in the affidavit stating "witnesses" stated they saw "two [B]lack males," as opposed to one Black male, was not false, misleading, or in reckless disregard for the truth, because it was a summary statement based on interviews with multiple witnesses and the majority of the witnesses interviewed saw two Black males. The court found the omission of Finley's failure to identify Short was not misleading or in reckless disregard for the truth.

### (b) Affidavits and Warrants for Searches of Cell Phone Information

Short alternatively objected to all evidence derived from the search of the LG flip phone and the LG smart phone, his call records, and his cell site location information for the reason that the warrants for the searches lacked the requisite particularity under the Fourth Amendment and the affidavits supporting the warrants lacked sufficient facts to support findings of probable cause. With regard to the lack of probable cause, Short argued that there was insufficient supporting averments establishing a nexus between the cell phone information to be searched and the crimes. According to Short, the affidavits generically set forth that cell phone data and information can be helpful in police investigations and the affidavits were devoid of evidence showing the use of cell phones in the specific crimes under investigation.

The court overruled the objections, finding that the affidavits supported probable cause and that the warrants did not lack in the necessary particularity. It referred back to its prior findings in relation to Short's motion to suppress before the mistrial, that the affidavit in support of the search warrant was sufficiently detailed and specific so as to establish probable cause that Short was connected to the ongoing Johnson homicide investigation and more than one individual may have been involved in the Johnson homicide. Applying the totality of the circumstances test, the court found that there was probable cause to believe that evidence of a crime would be found in the cell phone data of the two cell phones to be searched. The district court found in the alternative that even if the search warrants were not supported by probable cause, the warrants were executed in good faith. Further, the court found that the search warrants were particular because they specifically referred to the Johnson homicide and to the type of information encompassed by its authorization.

## III. ASSIGNMENTS OF ERROR

Short assigns, reworded, that the district court erred when it (1) denied his motion to suppress the fruits of the search of his residence after the "Franks hearing," when the affidavit in support of the search warrant provided insufficient evidence to support a finding of probable cause; (2) denied his motion to suppress the two cell phones taken from his person incident to his unlawful arrest; (3) denied his motion to suppress the information obtained from a search of the contents of the two cell phones, because the phones were seized unlawfully and the warrant was issued on insufficient evidence to support a finding of probable cause, was overly broad, and lacked particularity; (4) denied his motion to suppress call records and cell site location information from the cell phone service providers because that information was obtained pursuant to a search warrant that lacked sufficient probable cause, was overbroad, and lacked particularity and that the information in

the affidavit was the fruit of the unconstitutional search of his residence; (5) denied his motion to dismiss based on the State's failure to comply with discovery requirements; and (6) denied his motion for complete discharge because he was deprived of his constitutional right to a speedy trial.

## IV. STANDARD OF REVIEW

[1] Generally, a trial court's determination as to whether charges should be dismissed on speedy trial grounds is a factual question which will be affirmed on appeal unless clearly erroneous.[3]

[2] Trial courts have broad discretion with respect to sanctions involving discovery procedures, and their rulings thereon will not be reversed in the absence of an abuse of discretion.[4]

[3] In reviewing a trial court's ruling on a motion to suppress evidence based on a claimed violation of the Fourth Amendment, we apply a two-part standard of review. Regarding historical facts, we review the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that we review independently of the trial court's determination.[5]

[4] We review the trial court's findings as to whether the affidavit supporting the warrant contained falsehoods or omissions and whether those were made intentionally or with reckless disregard for the truth for clear error.[6] We review de novo the determination that any alleged falsehoods or omissions were not necessary to the probable cause finding.[7]

---

[3] *State v. Billingsley*, 309 Neb. 616, 961 N.W.2d 539 (2021).

[4] *State v. Case*, 304 Neb. 829, 937 N.W.2d 216 (2020); *State v. Hatfield*, 304 Neb. 66, 933 N.W.2d 78 (2019).

[5] *State v. Lowman*, 308 Neb. 482, 954 N.W.2d 905 (2021).

[6] See, *U.S. v. Mandell*, 752 F.3d 544 (2nd Cir. 2014); *U.S. v. Elkins*, 300 F.3d 638 (6th Cir. 2002); *U.S. v. Dozier*, 844 F.2d 701 (9th Cir. 1988); U.*S. v. Garcia-Zambrano*, 530 F.3d 1249 (10th Cir. 2008).

[7] See, e.g., *U.S. v. Mandell, supra* note 6.

[5] After-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review.[8] Instead, a judge's determination of probable cause to issue a search warrant should be paid great deference by reviewing courts.[9]

[6] Application of the good faith exception to the exclusionary rule is a question of law.[10]

## V. ANALYSIS

### 1. Late Disclosure of Discovery Materials

We first address Short's assignments that the trial court erred in denying his motions to dismiss and for absolute discharge. Short argues that under both due process and § 29-1919, the court should have dismissed the case against him as a sanction for the prosecution's delay in disclosing police interviews. Short does not argue that these delays, due to OPD's failure to timely generate reports on the interviews, resulted in the unavailability of exculpatory witness testimony. Instead, he asserts he was prejudiced because the delays implicated his speedy trial rights. Short alternatively asserts that the district court erred in denying his motion for absolute discharge (which is the same as dismissal with prejudice), because the need for continuances to adequately prepare his defense after the delayed disclosures deprived him of his constitutional right to a speedy trial.

### (a) Constitutional Speedy Trial Right

[7,8] We begin with the constitutional right to a speedy trial, since it lies at the core of all of Short's arguments concerning these motions. The Sixth Amendment to the U.S. Constitution provides, "In all criminal prosecutions, the accused shall

---

[8] *State v. Detweiler*, 249 Neb. 485, 544 N.W.2d 83 (1996) (quoting *Illinois v. Gates*, 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983)).

[9] See *id.*

[10] *State v. Sprunger*, 283 Neb. 531, 811 N.W.2d 235 (2012).

enjoy the right to a speedy . . . trial . . . ." Similarly, Neb. Const. art. I, § 11, provides, "In all criminal prosecutions, the accused shall have the right to . . . a speedy . . . trial . . . ." The right to a speedy trial is unique from other rights enshrined in the U.S. Constitution for the protection of the accused because there is a societal interest in providing a speedy trial, which exists separate from, and at times in opposition to, the interests of the accused.[11] The deprivation of the right to a speedy trial may work to the accused's advantage when adverse witnesses become unavailable or their memories fade over time.[12]

[9] "[T]he right to speedy trial is a . . . vague concept," since "[w]e cannot definitely say how long is too long in a system where justice is supposed to be swift but deliberate."[13] Instead, under the test set forth by the U.S. Supreme Court, we weigh (1) the length of delay, (2) the reason for the delay, (3) whether the defendant asserted his or her speedy trial rights, and (4) whether the defendant suffered possible prejudice.[14] None of the four factors is a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial; rather, they are related factors and must be considered together with other circumstances as may be relevant.[15] The length of the delay, however, is a triggering mechanism for the four-factor test.[16] Until there is some delay that is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance in determining if the right to a speedy trial has been violated.[17]

---

[11] See *State v. Hettle*, 288 Neb. 288, 848 N.W.2d 582 (2014).

[12] See *id.*

[13] *Barker v. Wingo, supra* note 1, 407 U.S. at 521.

[14] See, *Barker v. Wingo, supra* note 1; *State v. Lovvorn*, 303 Neb. 844, 932 N.W.2d 64 (2019).

[15] *Barker v. Wingo, supra* note 1.

[16] See, *id.*; *State v. Kula*, 254 Neb. 962, 579 N.W.2d 541 (1998).

[17] See *id.*

In the context of statutory rights to a speedy trial, several courts have held that delay caused by defense requests for continuances, which were necessitated by the prosecution's inexcusable delays in furnishing obligatory discovery materials, are chargeable to the prosecution.[18] These courts reason, as Short does in this appeal, that the defendant ought not to be forced to choose between preserving statutory speedy trial rights and receiving all mandatory discovery well before trial.[19] But we have not found case law viewing with a similar sympathy arguments that delays due to continuances granted at the defense's request, in response to dilatory discovery behavior by the State, violate the defendant's constitutional right to a speedy trial.

[10] The court in *U.S. v. Shulick*[20] specifically rejected such an argument. The court explained:

> Counsel cannot seek and obtain continuances to give the defense more time to be ready for trial because of the Government's dilatory behavior and then after the fact reverse course and claim that the indictment should be dismissed on the ground that defendant's right to a speedy trial under the Constitution has been infringed because of that behavior.[21]

It continued, "Courts have cautioned against this sort of tactic and have particularly frowned upon it when the right is not asserted until the eve of trial."[22]

---

[18] See, *U.S. v. Hastings*, 847 F.2d 920 (1st Cir. 1988); *Colby v. McNeill*, 595 So. 2d 115 (Fla. App. 1992); *Com. v. Taylor*, 469 Mass. 516, 14 N.E.3d 955 (2014), *abrogated on other grounds, Commonwealth v. Dirico*, 480 Mass. 491, 111 N.E.3d 1062 (2018). See, also, *State v. Driver*, 270 Or. App. 287, 347 P.3d 359 (2015).

[19] See, *U.S. v. Hastings, supra* note 18; *Com. v. Taylor, supra* note 18.

[20] *U.S v. Shulick*, 290 F. Supp. 3d 332 (E.D. Penn. 2017).

[21] *Id.* at 342-43.

[22] *Id.* at 343.

The *Shulick* court relied upon *United States v. Loud Hawk*,[23] wherein the U.S. Supreme Court held that delays caused by the defendant's interlocutory appeal will not ordinarily weigh in favor of constitutional speedy trial claims. Defendants who resort to an interlocutory appeal "normally should not be able . . . to reap the reward of dismissal for failure to receive a speedy trial."[24] Further, "'Having sought the aid of the judicial process and realizing the deliberateness that a court employs in reaching a decision, [such] defendants are not now able to criticize the very process which they . . . called upon.' . . ."[25]

[11] We agree with this reasoning and find it applicable to the continuances sought and obtained by Short in response to the State's late disclosure of discovery materials before the mistrial. Short did not first seek dismissal under speedy trial principles, but waited until after the period of the continuances granted at his request to assert that trial had been delayed for too long. He cannot claim the loss of the fundamental right to a speedy trial through the inherent delays of a process he himself called upon—even if that process was to vindicate another fundamental right.

[12] Short did finally elect to stand on his constitutional right to a speedy trial when he filed his motion to dismiss or, in the alternative, for absolute discharge, after new late disclosures were made following the period of the requested continuances. However, in considering whether Short's constitutional rights to a speedy trial were violated, we must bear in mind there was a mistrial. Absent extraordinary circumstances, we do not consider the entire period of time beginning with the original charge or arrest in computing the length of the delay when there has been a mistrial.[26] Instead, the constitutional

---

[23] *United States v. Loud Hawk*, 474 U.S. 302, 106 S. Ct. 648, 88 L. Ed. 2d 640 (1986).

[24] *Id.*, 474 U.S. at 316.

[25] *Id.*, 474 U.S. at 316-17 (quoting *United States v. Auerbach*, 420 F.2d 921 (5th Cir. 1969)).

[26] See *State v. Kula, supra* note 16.

speedy trial analysis focuses only on the period after the mandate for a new trial and the subsequent retrial.[27]

[13] Only misconduct involving deliberate delay tactics designed to circumvent the right to a speedy trial is an extraordinary circumstance warranting consideration of the period of delay before a mistrial.[28] Assuming without deciding that OPD's conduct can be imputed to the prosecution for purposes of a constitutional speedy trial analysis, the trial court found that OPD, and particularly Phillips and Watson, did not act intentionally or in bad faith. We cannot say the court clearly erred in this determination. The record reflects no evidence that OPD's conduct constituted a deliberate tactic to circumvent Short's speedy trial rights. Thus, our speedy trial analysis considers only the period of delay following the mistrial.

[14,15] That period of delay was only 246 days, approximately 8 months. The U.S. Supreme Court has noted with approval that "[d]epending on the nature of the charges, the lower courts have generally found postaccusation delay 'presumptively prejudicial' at least as it approaches one year."[29] A delay of a year or more is the benchmark commonly recognized as presumptively prejudicial in a constitutional speedy trial analysis.[30] This is especially true for more complex and serious crimes. The more complex and serious the crime, the longer a delay might be tolerated, because society also has an interest in ensuring that longer sentences are rendered upon the most exact verdicts possible.[31]

Where the mistrial was not due to prosecutorial misconduct, other courts have applied the 1-year triggering period to

---

[27] See *id.*

[28] See *id*. See, also, *State v. McCormack*, 28 Wash. App. 65, 622 P.2d 1276 (1980).

[29] *Doggett v. United States*, 505 U.S. 647, 652 n.1, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992).

[30] See 23 C.J.S. *Criminal Procedure and Rights of Accused* § 842 (2016).

[31] *Lloyd v. State*, 207 Md. App. 322, 52 A.3d 161 (2012). See, also, *Barker v. Wingo, supra* note 1.

the delay in bringing the defendant to trial after a mistrial.[32] The mistrial in this case was not in any way due to prosecutorial misconduct, but was due to misconduct by a third party associated with Short. Short will not benefit, in a speedy trial analysis, from such misconduct. Given the complexity of this case—involving two murder charges and multiple shootings—we do not find the 246-day delay to be presumptively prejudicial.

We thus need not engage in the four-factor analysis to conclude that Short's constitutional right to a speedy trial was not violated. But, for the sake of completeness, we find that the *Barker* four-factor analysis would not lead us to a different conclusion. The order of the district court setting the date for retrial was agreed upon by the parties and nothing in the record, or in Short's brief, disputes this. In the same vein, at no point after the mistrial did Short make a constitutional speedy trial challenge to the delay in commencing the new trial. While courts cannot presume waiver of fundamental constitutional rights from inaction or from a silent record, "the defendant's assertion of or failure to assert his [or her] right to a speedy trial is one of the factors to be considered in an inquiry into the deprivation of the right," and a failure to assert speedy trial rights will make it difficult for the defendant to prove the denial of a speedy trial.[33] And the court found, as discussed, the delays were not intentional or in bad faith. Finally, Short makes no argument that he was prejudiced by the delay in terms of ultimately mounting his defense at trial, though he asserts he was incarcerated for an oppressive length of time.

Generally, a trial court's determination as to whether charges should be dismissed on speedy trial grounds is a factual question which will be affirmed on appeal unless clearly

---

[32] See, *People v. Landau*, 214 Cal. App. 4th 1, 154 Cal. Rptr. 3d 1 (2013); *Whatley v. State*, 326 Ga. App. 81, 755 S.E.2d 885 (2014); *State v. Echols*, 146 Ohio App. 3d 81, 765 N.E.2d 379 (2001).

[33] *Barker v. Wingo, supra* note 1, 407 U.S. at 528.

erroneous.[34] We hold that the district court did not clearly err in finding that Short's constitutional speedy trial right was not violated.

### (b) Due Process

To the extent Short attempts to assert an independent violation of due process because of the delays attributable to the late discovery disclosures, we find such assertion to also be without merit.

[16] Due process concepts of fundamental fairness, requiring that criminal defendants be afforded a meaningful opportunity to present a complete defense, involve "what might loosely be called the area of constitutionally guaranteed access to evidence."[35] This group of constitutional privileges delivers exculpatory evidence into the hands of the accused, thereby protecting the innocent from erroneous conviction and ensuring the integrity of our criminal justice system.[36] A defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to the guilt of the defendant or relevant to the punishment to be imposed.[37]

[17] Delays in this context can be prejudicial when the favorable evidence material to either guilt or punishment is either permanently lost or not disclosed before the end of trial.[38] The U.S. Supreme Court has held the rule that state suppression of favorable material evidence violates due process encompasses evidence known only to police investigators

---

[34] *State v. Lovvorn, supra* note 14; *State v. Smith*, 286 Neb. 856, 839 N.W.2d 333 (2013).

[35] *California v. Trombetta*, 467 U.S. 479, 485, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984) (internal quotation marks omitted).

[36] *Id.*

[37] *Id.*

[38] See *id.* See, also, e.g., *State v. Clifton*, 296 Neb. 135, 892 N.W.2d 112 (2017).

and not to the prosecutor.[39] In other words, police conduct resulting in suppression of favorable material evidence is imputed to the prosecution.

[18,19] But we have repeatedly held there is no due process violation when the defendant has had an opportunity to request a continuance to adequately prepare the defense in light of evidence that, while disclosed late, is ultimately disclosed before the end of trial.[40] Further, we have rejected the idea that due process protects against delays in bringing the accused to trial after arrest or indictment, as opposed to prearrest or indictment delay.[41] This is because "[t]he Fifth Amendment has only a 'limited role to play in protecting against oppressive delay' in the criminal context."[42]

We similarly reject the notion, proposed by Short, that late disclosure of evidence resulting in a continuance at the behest of the defendant violates due process because it delays bringing the accused to trial after arrest or indictment. The Fifth Amendment right to access to evidence in such circumstances is adequately protected by the trial court's discretion, as set forth in § 29-1919, to issue discovery sanctions.

### (c) Discovery Sanctions

[20] Discovery in a criminal case is generally controlled by either a statute or a court rule.[43] Trial courts have broad discretion with respect to sanctions involving discovery procedures, and their rulings thereon will not be reversed in the absence of an abuse of discretion.[44] Section 29-1919 states:

---

[39] See, *Strickler v. Greene*, 527 U.S. 263, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999); *Kyles v. Whitley*, 514 U.S. 419, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995).

[40] See, e.g., *State v. Clifton, supra* note 38.

[41] See, *State v. Oldson*, 293 Neb. 718, 884 N.W.2d 10 (2016); *State v. Hettle, supra* note 11.

[42] *State v. Hettle, supra* note 11, 288 Neb. at 304, 848 N.W.2d at 596.

[43] *State v. Hatfield, supra* note 4.

[44] *State v. Case, supra* note 4; *State v. Hatfield, supra* note 4.

If, at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with . . . sections 29-1912 to 29-1921 or an order issued pursuant to . . . sections 29-1912 to 29-1921, the court may:

(1) Order such party to permit the discovery or inspection of materials not previously disclosed;

(2) Grant a continuance;

(3) Prohibit the party from calling a witness not disclosed or introducing in evidence the material not disclosed; or

(4) Enter such other order as it deems just under the circumstances.

[21] When a court sanctions the government in a criminal case for its failure to obey court orders, it must use the least severe sanction that will adequately punish the government and secure future compliance.[45] This court has a preference for a continuance in such situations and has previously held in discovery disputes that where a continuance can cure any prejudice by a failure to disclose, it is that remedy that should be utilized.[46] The continuance is seen as the vehicle that commonly will eliminate the prejudice of surprise by placing the defense in a position similar to that in which it would have stood if timely disclosure had been made.[47]

[22] Dismissal is the most severe sanction and is only appropriate in the most extreme circumstances involving bad faith or violations that result in irremediable harm that prevents the possibility of a fair trial.[48] Dismissal as a sanction for a discovery violation is only appropriate where less drastic alternatives are not available.[49]

---

[45] *U.S. v. DeCoteau*, 186 F.3d 1008 (8th Cir. 1999).

[46] *State v. Hatfield, supra* note 4.

[47] 5 Wayne R. LaFave et al., Criminal Procedure § 20.6 (4th ed. 2015).

[48] See, 22A C.J.S. *Criminal Procedure and Rights of Accused* § 468 (2016); Annot., 10 A.L.R.7th Art. 6 (2016).

[49] See *id.*

In its order denying Short's motion, the district court determined the late disclosures were not intentional or in bad faith by either OPD or the prosecution. This factual finding was not clearly erroneous. The district court also found the prejudice to Short would be removed when, once provided the discovery information, Short were afforded an adequate opportunity to make use of the information and material in the preparation of his defense. Based on that, the court stated that if Short requested a continuance, the court would grant it. It declined to impose the extreme sanction of dismissal. Short never requested a continuance after the court's ruling.

[23] An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[50] We have already determined that Short's right to a speedy trial was not violated through the late disclosures of discovery materials. We are, as was the court below, deeply concerned with the level of neglect that resulted in the late disclosures in this case. But the court did not clearly err in finding it was not the result of intentional or reckless conduct, and the record reflects that OPD had taken disciplinary measures to remedy the situation. We find no abuse of discretion in the district court's determination that a continuance, if requested, was the least severe sanction that would adequately punish the government and secure future compliance, and certainly, it did not abuse its discretion in refusing to impose the most severe sanction of dismissal.

## 2. FRUITS OF SEARCH OF SHORT'S RESIDENCE

Short's remaining assignments of error pertain to his objections to the admission of evidence as fruits of various Fourth Amendment violations. The Fourth Amendment itself explicitly sets out the requirements of a warrant: "[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched,

---

[50] *State v. Wheeler*, 308 Neb. 708, 956 N.W.2d 708 (2021).

and the persons or things to be seized." Short's first assertion in this regard is the court erred in admitting the fruits of the search of his residence, which consisted of two handguns, items of clothing, and venue items connecting Short to the LG smart phone.

[24,25] To determine whether a warrant was issued upon probable cause, a court generally limits its review to the four corners of the affidavit.[51] An exception to that limitation is where the defendant makes a preliminary proffer of falsity warranting an evidentiary hearing.[52] Short does not contest that, as written, the four corners of the affidavit supporting the warrant to search his residence establish probable cause. Instead, Short argues that the warrant for the search of his residence was invalid, because its supporting affidavit contained material falsities and omissions, and that the district court erred, upon the evidentiary hearing held below, in concluding differently.

[26] In *Franks v. Delaware*,[53] the U.S. Supreme Court explained, "'[W]hen the Fourth Amendment demands a factual showing sufficient to comprise "probable cause," the obvious assumption is that there will be a *truthful* showing.'" The Court clarified this "does not mean 'truthful' in the sense that every fact recited in the warrant affidavit is necessarily correct."[54] Rather, it recognized probable cause may be founded upon hearsay as well as "upon information within the affiant's own knowledge that sometimes must be garnered hastily."[55] It concluded that "surely it is to be 'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true."[56]

---

[51] See *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978).

[52] See *id.*

[53] *Id.*, 438 U.S. at 164-65.

[54] *Id.*, 438 U.S. at 165.

[55] *Id.*

[56] *Id.*

[27] In contrast, it would be "unthinkable" to allow a warrant to stand beyond impeachment if it were revealed after the fact to contain a "deliberately or reckless false statement."[57] Thus, while there is a presumption of validity with respect to the affidavit supporting the search warrant, that presumption may be overcome and a search warrant may be invalidated if the defendant proves the affiant officer "'knowingly and intentionally, or with reckless disregard for the truth,'" included in the affidavit false or misleading statements that were necessary, or "material," to establishing probable cause.[58]

[28] Courts have extended the *Franks* rationale to omissions in warrant affidavits of material information.[59] Omissions in an affidavit used to obtain a search warrant are considered to be misleading when the facts contained in the omitted material tend to weaken or damage the inferences which can logically be drawn from the facts as stated in the affidavit.[60]

[29] If the defendant successfully proves, by a preponderance of the evidence,[61] that the police knowingly and intentionally, or with reckless disregard for the truth, included a false or misleading statement or omitted information material to a probable cause finding, then the court examines whether the evidence obtained from the warrant and search was fruit of the poisonous tree.[62] In an "'excise and re-examine' corollary to the independent source rule,"[63] the trial court

---

[57] *Id.*

[58] *See State v. Schuller*, 287 Neb. 500, 507, 843 N.W.2d 626, 632 (2014) (quoting *Franks v. Delaware, supra* note 51).

[59] *State v. Schuller, supra* note 58.

[60] *State v. Spidel*, 10 Neb. App. 605, 634 N.W.2d 825 (2001) (citing *State v. Utterback*, 240 Neb. 981, 485 N.W.2d 760 (1992)).

[61] See, *Franks v. Delaware, supra* note 51. See, also, *U.S. v. Davis, supra* note 2.

[62] See, *Franks v. Delaware, supra* note 51; *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963); *State v. Schuller, supra* note 58.

[63] *State v. McKinney*, 361 N.C. 53, 59, 637 S.E.2d 868, 872 (2006).

reexamines the affidavit after deleting the false or misleading statement and including the omitted information, and it determines whether, viewed under the totality of the circumstances, it still establishes probable cause.[64] If it does not, then *Franks* requires that the search warrant be voided and the fruits of the search excluded.[65]

[30] Mere negligence in preparing the affidavit will not lead to suppression, as the purpose of the exclusionary rule is to deter misconduct.[66] We review the trial court's findings as to whether the affidavit supporting the warrant contained falsehoods or omissions and whether those were made intentionally or with reckless disregard for the truth for clear error.[67] We review de novo the determination that any alleged falsehoods or omissions were not necessary to the probable cause finding.[68]

In considering whether the district court erred in overruling Short's objection to the evidence derived from the search of his residence, we will consider only what has been both specifically assigned and specifically argued.[69] We do not consider on appeal every aspect of the affidavit challenged below simply because Short reiterated those as a factual background in the argument section of his brief.

Looking at what is specifically argued on appeal to be material untruths, Short first points to the statement in the affidavit that Short's fingerprint was found on a glove near the scene

---

[64] See *State v. Schuller, supra* note 58. See, also, *Franks v. Delaware, supra* note 51; *U.S. v. Eng*, 571 F. Supp. 2d 239 (D. Mass. 2008); *Redding v. State*, 192 Ga. App. 87, 383 S.E.2d 640 (1989); *State v. Olson*, 11 Kan. App. 2d 485, 726 P.2d 1347 (1986); *State v. Cuong Phu Le*, 463 S.W.3d 872 (Tex. Crim. App. 2015).

[65] *State v. Schuller, supra* note 58.

[66] See *State v. Bromm*, 285 Neb. 193, 826 N.W.2d 270 (2013).

[67] See, *U.S. v. Mandell, supra* note 6; *U.S. v. Elkins, supra* note 6; *U.S. v. Dozier, supra* note 6; *U.S. v. Garcia-Zambrano, supra* note 6.

[68] See, e.g., *U.S. v. Mandell, supra* note 6.

[69] See, e.g., *State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019).

of the crime, when in fact it had been found on a pricetag. Second, Short points to the statement in the affidavit that Short was located at 4268 Binney Street, when Short was actually located walking toward 4268 Binney Street, inside the crime scene perimeter tape, three or four houses away.

Third, Short points to the statement that "witnesses stated after the shooting two [B]lack males were seen running through yards and got into a white Chevy Monte Carlo." He asserts this falsely indicated eyewitnesses to the shooting also observed the same suspects get into the Monte Carlo when, instead, the assertion in the affidavit was a compilation by Culler of the observations made by multiple witnesses, none of whom both saw the shooting and saw the suspects get into the Monte Carlo. Short asserts the record establishes that no eyewitness to the shooting was aware of the existence of the white Chevy Monte Carlo and that only one witness, unaware at that time a shooting had taken place, observed two males enter the white Monte Carlo.

The only omission argued on appeal is that Finley was unable to identify Short as the suspect when shown a photographic spread.

The district court found that the misstatements and omissions were not made intentionally, in bad faith, or in reckless disregard for the truth and, further, that the misstatements and omissions were not material to the finding of sufficient probable cause. We hold the district court did not clearly err in finding that the misstatements and omissions were not made intentionally, in bad faith, or in reckless disregard for the truth.

Short points out that Hinsley's and Culler's testimonies were in conflict with each other. Hinsley testified that Culler may have misspoken when she relayed to him that the fingerprint was on a glove. Culler, in contrast, testified that she was clear in her conversation with Hinsley the fingerprint was on a pricetag and that Hinsley made an innocent mistake in the affidavit. But it does not follow from Hinsley's and Culler's

differing recollections as to which of them was the original source of the misstatement that the district court clearly erred in determining the misstatement was unintentional and was made in good faith with due care.

[31] Other than noting Culler's inexperience in the homicide unit and an internal affairs investigation into Hinsley's professional misconduct in an unrelated situation, Short does not present additional illustration of how he proved by a preponderance of the evidence the alleged false statements and omissions were made knowingly and intentionally or with reckless disregard for the truth. There was no evidence that the statement regarding where exactly Short was found or what item his fingerprint was found on was anything other than inadvertent. With regard to the omission of the photographic spread, Finley had told Hinsley there may have been two individuals. Thus, Hinsley may have overlooked the materiality of the failure to identify Short, when Finley saw only one of the shooters. Regarding the statement about witnesses seeing two Black males running toward a white Chevy Monte Carlo after the shooting, this court has held that observations by fellow officers engaged in a common investigation are a reliable basis for a warrant and that probable cause is to be evaluated by the collective information of the police as reflected in the affidavit and is not limited to the firsthand knowledge of the officer who executes the affidavit.[70]

Because the district court did not clearly err in finding the alleged falsehoods or omissions were not made knowingly and intentionally or with a reckless disregard for the truth, we need not review the district court's reexamination of the affidavit after deleting the false or misleading statement and including the omitted information. We find no merit to Short's assertion that the district court erred in refusing to suppress the evidence derived from the search of his residence.

---

[70] *State v. Stickelman*, 207 Neb. 429, 299 N.W.2d 520 (1980).

### 3. Fruits of Search of Short's Cell Phones, Call Records, and Location Information

Short's other Fourth Amendment arguments concern the admission of evidence derived from the search of Short's cell phones, call records, and cell phone location information. He argues the contents within the four corners of the affidavits for the relevant search warrants failed to establish probable cause. He also asserts the warrants themselves lacked particularity. And, with respect to the search of the cell phones, Short argues they were seized in violation of the Fourth Amendment.

### (a) Affidavits Supporting Probable Cause

We first examine the sufficiency of the affidavits challenged on appeal. Short asserts the affidavit for the search of his cell phones and the affidavit in support of the 2018 search warrant for his LG smart phone's call records and cell site location information both lack a nexus between the crimes under investigation and the items to be searched. And Short claims the affidavits are so facially inadequate that the good faith exception to the exclusionary rule does not apply.

[32,33] Probable cause sufficient to justify issuance of a search warrant means a fair probability that contraband or evidence of a crime will be found in the item to be searched.[71] The Fourth Amendment's express requirement of particularity for a search warrant is closely related to its express requirement of probable cause.[72] Thus, the U.S. Supreme Court has explained the critical element in a reasonable search of property is not that the owner of property is suspected of crime, but, rather, that there is reasonable cause to believe the specific things to be searched for and seized are located on the property to which entry is sought.[73]

---

[71] *State v. Said*, 306 Neb. 314, 945 N.W.2d 152 (2020).

[72] See *State v. Sprunger, supra* note 10.

[73] *Zurcher v. Stanford Daily*, 436 U.S. 547, 98 S. Ct. 1970, 56 L. Ed. 2d 525 (1978).

[34,35] A warrant affidavit must always set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of probable cause.[74] The nexus between the alleged crimes and the article to be searched, however, does not need to be based on direct observation; it can be found in the type of crime, the nature of the evidence sought, and the normal inferences as to where such evidence may be found.[75]

[36,37] Probable cause may be based on "common-sense conclusions about human behavior,"[76] and due weight should be given to inferences by law enforcement officers based on their experience and specialized training.[77] But wholly conclusory statements by a law enforcement officer affiant that the affiant has reliable information and reason to believe evidence of a crime will be found in a particular place are insufficient.[78]

[38,39] "Probable cause" is a term of art in Fourth Amendment jurisprudence that is defined as a "practical, non-technical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent [persons] not legal technicians, act."[79] The fundamental question in a challenge to an affidavit for lack of probable cause is whether, under the totality of the circumstances illustrated by the affidavit, the issuing magistrate had a substantial basis for finding that the affidavit established probable cause.[80]

---

[74] See *Franks v. Delaware, supra* note 51.

[75] See *Commonwealth v. Snow*, 486 Mass. 582, 160 N.E.3d 277 (2021).

[76] *Illinois v. Gates, supra* note 8, 462 U.S. at 231 (internal quotation marks omitted).

[77] See *United States v. Arvizu*, 534 U.S. 266, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002).

[78] See *Illinois v. Gates, supra* note 8.

[79] *Maryland v. Pringle*, 540 U.S. 366, 370, 124 S. Ct. 795, 157 L. Ed. 2d 769 (2003) (internal quotation marks omitted).

[80] *State v. Said, supra* note 71; *State v. Hernandez*, 268 Neb. 934, 689 N.W.2d 579 (2004).

[40-42] The magistrate who is evaluating the probable cause question must make a practical, commonsense decision whether, given the totality of the circumstances set forth in the affidavit, including the veracity of and basis of knowledge of the persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.[81] Ultimately, where the circumstances are detailed, where reasons for crediting the source of information is given, and where the magistrate has found probable cause to exist, the court should not invalidate the affidavit in a hyper-technical manner.[82] Reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause,[83] and after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review.[84] Instead, a judge's determination of probable cause to issue a search warrant should be paid great deference by reviewing courts.[85]

With respect to the affidavit in support of the search of his phones, Short generally asserts it was a "bare bones" affidavit that gave the magistrate virtually no basis for making an independent judgment regarding probable cause.[86] Short's more specific argument, though, is that the only information in the affidavit pertaining to the required nexus between the crimes and the information contained on the phones is that Short was a suspect and that in the officer's experience, it is not uncommon for those suspected of criminal activity to have evidence of that crime on their cell phones.

---

[81] *State v. Hernandez, supra* note 80.

[82] See *State v. Stickelman, supra* note 70.

[83] *United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984).

[84] *State v. Detweiler, supra* note 8.

[85] See *id.*

[86] See brief for appellant at 53.

Short's arguments with respect to the 2018 affidavit in support of the search of Short's call records and cell site location information are similar. Short claims the 2018 affidavit "simply contains boilerplate assertions of generic 'criminals' conduct'" without "any information specific as to why there is probable cause to believe that [the call records and cell site location information] will contain evidence of the crime under investigation."[87]

In *State v. Said*,[88] we held the affidavit supporting the search warrant for the contents of a cell phone was sufficient to establish probable cause when, in addition to statements setting forth the officer's general knowledge of how cell phones may be used by a person who has committed a crime and that evidence of the crime may generally be found on a suspect's cell phone, the affidavit set forth specific information derived from the investigation indicating the suspect's involvement in the crime, as well as allegations that the suspect had communicated with others and sought information regarding that crime. We explained the judge could infer from this information the suspect likely used his cell phone to search the internet for information and in communicating with others about the crime.

[43,44] We did not elaborate in *Said* upon general principles applicable to affidavits for searches of cell phone information or describe what other hypothetical facts would or would not support probable cause to search a cell phone or cell phone information. But several other courts have addressed the issue. We agree with these courts that law enforcement cannot only "rely on the general ubiquitous presence of cellular telephones in daily life, or an inference that friends or associates most often communicate by cellular telephone, as a substitute for particularized information to support probable

---

[87] *Id.* at 76.

[88] *State v. Said, supra* note 71.

cause that a specific device contains evidence of a crime."[89] To support probable cause, statements based on law enforcement expertise and experience must be accompanied by particular facts and circumstances such that, under the totality of the circumstances, including commonsense conclusions about human behavior, there is a substantial basis for concluding evidence of a crime will be found on the phone or phone information searched.

[45,46] What will constitute sufficient particularized information to support probable cause that a cell phone or cell phone information searched will contain evidence of a crime depends upon the nature and circumstances of the crime and what is sought in the warrant. For example, to search the contents of cell phones in relation to a crime involving an accomplice, courts have found affidavits provide sufficient support for probable cause when they contain averments showing the suspect was working with at least one other person when the crime was committed; was in possession of a cell phone near the time of the crime; and a law officer, based on experience and specialized training, believed the search likely to yield evidence of communications and coordination among these multiple participants.[90] To search cell site location information, in contrast, courts have found the necessary nexus where there were facts in the affidavit showing the suspect probably committed a crime, the nature of which makes location information possibly incriminating, and the suspect was known to own or use the particular phone.[91] It can be generally recognized

---

[89] *Commonwealth v. Morin*, 478 Mass. 415, 426, 85 N.E.3d 949, 960 (2017).

[90] See, *U.S. v. Lavallis*, 515 F. Supp. 3d 686 (E.D. Mich. 2021); *U.S. v. Gholston*, 993 F. Supp. 2d 704 (E.D. Mich. 2014); *Johnson v. State*, 2015 Ark. 387, 472 S.W.3d 486 (2015). See, also, *U.S. v. Barret*, 824 F. Supp. 2d 419 (E.D.N.Y. 2011).

[91] See *Commonwealth v. Hobbs*, 482 Mass. 538, 125 N.E.3d 59 (2019). See, also, *United States v. Hunt*, 718 Fed. Appx. 328 (6th Cir. 2017); *U.S. v. Gibbs*, 547 Fed. Appx. 174 (4th Cir. 2013).

that cell phones tend to accompany their users everywhere, and thus, it may be inferred that a suspect's cell phone probably accompanied the suspect at the time of the crime.[92]

[47] Neither affidavit at issue in this appeal contains merely conclusory statements. Both lengthy affidavits, described in detail in the background section above, were far from "bare bones." A warrant may be considered so lacking in indicia of probable cause if the applicant files merely a bare bones affidavit, one which contains only wholly conclusory statements and presents essentially no evidence outside of such conclusory statements.[93]

The affidavits set forth numerous specific facts derived from the investigation supporting the probability that Short was involved in the homicides. The question is whether the specific averments provided a substantial basis for the likelihood that searching the cell phones, call records, and cell site location information would produce evidence of the specific criminal activity described. However, the district court found that regardless of whether the information within the four corners of the affidavits contained sufficient particularized information to support probable cause that the information authorized by the warrants to be searched would contain evidence of a crime, the officers acted in good faith in carrying out the warrants. We agree the good faith exception applies.

[48,49] Application of the good faith exception to the exclusionary rule is a question of law.[94] The U.S. Supreme Court has explained that to trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter such conduct and sufficiently culpable that such deterrence is worth the price paid by the justice system, as exclusion serves to deter deliberate, reckless, or grossly negligent

---

[92] See *id.*

[93] *Stevenson v. State*, 455 Md. 709, 168 A.3d 967 (2017).

[94] *State v. Sprunger, supra* note 10.

conduct, or in some circumstances recurring or systemic negligence.[95] The good faith exception is applicable to an affidavit that fails to satisfy the substantial basis test to support probable cause, when police officers act in objectively reasonable good faith in reliance upon the warrant.[96]

The good faith inquiry is confined to the objectively ascertainable question of whether a reasonably well-trained officer would have known that the search was illegal despite a magistrate's authorization.[97] In assessing the good faith of an officer's conducting a search under a warrant, an appellate court must look to the totality of the circumstances surrounding the issuance of the warrant, including information not contained within the four corners of the affidavit.[98] When evaluating whether the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable, an appellate court should address whether the officer, considered as a police officer with a reasonable knowledge of what the law prohibits, acted in objectively reasonable good faith in relying on the warrant.[99] It has also been said:

> If the reviewing court is "able to identify in the averring officer's affidavit *some* connection, regardless of how remote it may have been"—"some modicum of evidence, however slight"—"between the criminal activity at issue and the place to be searched," then the affidavit is not bare bones and official reliance on it is reasonable."[100]

---

[95] *Herring v. United States*, 555 U.S. 135, 129 S. Ct. 695, 172 L. Ed. 2d 496 (2009).

[96] See *State v. Sprunger, supra* note 10.

[97] *Id*.

[98] *Id.*

[99] See, *United States v. Leon, supra* note 83; *State v. Sprunger, supra* note 10; *State v. Nuss*, 279 Neb. 648, 781 N.W.2d 60 (2010); *State v. Edmonson*, 257 Neb. 468, 598 N.W.2d 450 (1999).

[100] *U.S. v. White*, 874 F.3d 490, 497 (6th Cir. 2017).

The affidavits contained a modicum of evidence between the criminal activity at issue and the places to be searched, and the knowledge of law enforcement outside the four corners of the affidavits provided a sufficient basis for the likelihood that evidence of the criminal activity would be found in the particular places searched. The law in Nebraska and elsewhere concerning the minimum allegations to support a search of a cell phone, call records, or location information is fact specific, and we have not addressed similar affidavits. Accordingly, while we assume law enforcement has reasonable knowledge of the law, the law was not sufficiently clear with respect to the affidavits at issue for us to conclude law enforcement was entirely unreasonable in its belief they were sufficient.

Assuming without deciding the warrants to search Short's cell phones, call records, and cell site location information were not supported by a substantial basis for their issuance, we find the police relied in good faith upon the warrants when executing the searches. Accordingly, the district court did not err in overruling Short's objections based on alleged deficiencies in the warrants' supporting affidavits.

## (b) Particularity of Warrants

[50,51] We next examine the particularity of the two warrants. In addition to the requirement of probable cause, the Fourth Amendment and article I, § 7, of the Nebraska Constitution contain a particularity requirement that a warrant describe the place to be searched and the persons or things to be seized. "It is familiar history that indiscriminate searches and seizures conducted under the authority of 'general warrants' were the immediate evils that motivated the framing and adoption of the Fourth Amendment."[101] A purpose of the particularity requirement for a search warrant is to prevent the issuance of warrants on loose, vague, or doubtful bases of fact.[102] The particularity

---

[101] *Payton v. New York*, 445 U.S. 573, 583, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980).

[102] *State v. Said, supra* note 71.

requirement of the Fourth Amendment protects against open-ended warrants that leave the scope of the search to the discretion of the officer executing the warrant or permits seizure of items other than what is described.[103] Simply put, the Fourth Amendment prohibits "fishing expeditions."[104]

[52-55] To satisfy the particularity requirement of the Fourth Amendment, a warrant must be sufficiently definite to enable the searching officer to identify the property authorized to be seized.[105] The degree of specificity required in a warrant depends on the circumstances of the case and on the type of items involved.[106] A search warrant may be sufficiently particular even though it describes the items to be seized in broad or generic terms, if the description is as particular as the supporting evidence will allow; but the broader the scope of a warrant, the stronger the evidentiary showing must be to establish probable cause.[107] A warrant for the search of the contents of a cell phone must be sufficiently limited in scope to allow a search of only that content that is related to the probable cause that justifies the search.[108]

Short argues the warrants to search the contents of his physical cell phones, call data, and cell site location information simply eliminated the "'any and all'" language we previously held to be overly broad and replaced it with "a laundry list of everything possibly contained in a cell phone."[109] Further, Short takes particular exception to the sentence in the warrant for the physical cell phones authorizing law enforcement to "examine every file and scan its contents briefly to determine whether it falls within the scope of the warrant," which he

---

[103] *State v. Jennings*, 305 Neb. 809, 942 N.W.2d 753 (2020).

[104] *State v. Sprunger, supra* note 10.

[105] *State v. Said, supra* note 71.

[106] *Id*.

[107] *Id*.

[108] *Id*.

[109] Brief for appellant at 66 (citing *State v. Henderson*, 289 Neb. 271, 854 N.W.2d 616 (2014)).

asserts authorized law enforcement to "'rummage around'" to see what they might find.[110]

Other courts have rejected the argument that an authorization in a warrant to "examine every file and scan its contents briefly to determine whether it falls within the scope of the warrant," or similar language, violates the particularity clause of the Fourth Amendment.[111] Courts reason that scanning all digital information related to a cell phone is like searching everywhere in a house for evidence of drugs or searching every document in a filing cabinet when the incriminating evidence may be found in any file or folder. Neither search is overbroad, because "[c]riminals don't advertise where they keep evidence."[112] A cell phone serves the same function as a filing cabinet, and there is no way for law enforcement to know in advance how a suspect may label or code files that contain evidence of criminal activity.[113]

The U.S. Supreme Court in *Riley v. California*,[114] in holding a warrant is required to search data stored in cell phones seized incident to arrest, recognized "a cell phone search would typically expose to the government far *more* than the most exhaustive search of a house." The Court did not thereby suggest that such an extensive search would be impermissible with a warrant.

[56,57] Officers cannot predict where evidence of a crime will be located in a cell phone or call records or in what

---

[110] Brief for appellant at 67.

[111] See, *State v. Johnson*, 576 S.W.3d 205 (Mo. App. 2019); *State v. Swing*, 2017 Ohio 8039, 98 N.E.3d 828 (2017); *State v. Savath*, 298 Or. App. 495, 447 P.3d 1 (2019). See, also, e.g., *U.S. v. Stabile*, 633 F.3d 219 (3rd Cir. 2011); *Com v. McDermott*, 448 Mass. 750, 864 N.E.2d 471 (2007).

[112] *U.S. v. Bishop*, 910 F.3d 335, 336 (7th Cir. 2018). See, also, *Andresen v. Maryland*, 427 U.S. 463, 96 S. Ct. 2737, 49 L. Ed. 2d 627 (1976); *State v. Johnson, supra* note 111.

[113] See *id.*

[114] *Riley v. California*, 573 U.S. 373, 396, 134 S. Ct. 2473, 189 L. Ed. 2d 430 (2014).

format, such as texts, videos, photographs, emails, or applications.[115] There is no way for law enforcement to know where in the digital information associated with cell phones it will find evidence of the specified crime.[116] Sophisticated users can hide digital data in complex ways.[117]

[58,59] Thus, courts refuse to require ex ante limitations based on file or data type or specific application.[118] In an electronic search, law enforcement will likely need to examine, at least briefly, information or data beyond that identified in the warrant.[119] The most important constraint in preventing unconstitutional exploratory rummaging is that the warrant limit the search to evidence of a specific crime, ordinarily within a specific time period, rather than allowing a fishing expedition for all criminal activity.[120] We agree that a brief examination of all electronic data associated with a cell phone is usually necessary in order to find where the information to be seized is located, and such examination is reasonable under the Fourth Amendment. We accordingly hold that the breadth of electronic information that the warrants here authorized law enforcement to sift through did not render them unconstitutional under the particularity clause of the Fourth Amendment.

Regarding the extensiveness of the list of items to be searched for and seized, while sifting through the extensive data, this court in *State v. Goynes*[121] has already found sufficiently particular a warrant allowing a search for and seizure

---

[115] See *State v. Johnson, supra* note 111.

[116] See *id.*

[117] *State v. Mansor*, 363 Or. 185, 421 P.3d 323 (2018).

[118] See *id.*

[119] *State v. Savath, supra* note 111.

[120] See, e.g., *U.S. v. Castro*, 881 F.3d 961 (6th Cir. 2018); *U.S. v. Bass*, 785 F.3d 1043 (6th Cir. 2015); *U.S. v. Bishop, supra* note 112; *State v. Johnson, supra* note 111; *People v. English*, 52 Misc. 3d 318, 32 N.Y.S.3d 837 (2016). See, also, *Wheeler v. State*, 135 A.3d 282 (Del. 2016).

[121] *State v. Goynes*, 303 Neb. 129, 927 N.W.2d 346 (2019).

of a list of data types almost identical to the most extensive of the two warrants here at issue—when, like here, the search was constrained to evidence of the specific crime. The items listed in the warrant in *Goynes* included all of the following:

> cell phone information, configurations, calendar events, notes, and user account information which could identify who owns or was using a cell phone; call logs which could establish familiarity between people involved and timelines of an incident; short and multimedia messaging service messages, chat and instant messages, and emails which could provide insight to establish an individual's level of culpability and knowledge of the incident; installed application data which could aid in determining a user's historical geographic location and demonstrate the user's association with investigated people, location, and events; media files such as images, videos, audio, and documents which could provide times and locations, as well as firsthand documentation of the incident; internet browsing history which could demonstrate the planning, desire, and participation in a crime; cell tower connections, global positioning system data, Wi-Fi, Bluetooth, and synchronization logs which could provide information on location in relation to the incident; and user dictionary information which could demonstrate familiarity with the crime being investigated.[122]

We rejected the argument that because the extensive list encompassed practically the entirety of the data contained within cell phones, it was no different than a warrant authorizing the search of "any and all" information stored on a cell phone.[123]

We explained in *Goynes* that the warrants in *Henderson* violated the requirements of particularity because, in addition to listed types of cell phone data to search, they authorized

---

[122] *Id.* at 142-43, 927 N.W.2d at 356.

[123] *Id.* at 143, 927 N.W.2d at 356 (internal quotation marks omitted).

a broad search of "any other information that can be gained from the internal components and/or memory Cards" and failed to refer to a specific crime being investigated.[124] We clarified in *Goynes* that "*Henderson* does not stand for the rule that a search of a cell phone cannot be expansive."[125]

We held that the list in the affidavit at issue in *Goynes*, while expansive, was not insufficiently particular and did not violate the Fourth Amendment. This was because the warrant described the crime, listed the specific areas to be searched, and did not contain unqualified language that would permit the search of the cell phone for "any other information."[126]

Neither warrant at issue here contained the catchall phrase we found unconstitutional in *Henderson.* The 2018 warrant for the call records and cell site location information specified the crime of homicide and a limited time period of July 8 to August 10, 2015. The warrant to search the physical cell phones limited the search to evidence relating to the homicide of Johnson. While both warrants might be viewed as extensive, they did not lack in particularity. The authorization to "examine every file and scan its contents briefly to determine whether it falls within the scope of the warrant" does not negate that particularity. The district court did not err in determining the warrants satisfied the particularity requirements of the Fourth Amendment.

### (c) Pat-Down Search and Seizure of Cell Phones

Lastly, we find no merit to Short's argument that the searches of his phones are tainted by their alleged illegal seizure. The phone number information was independently found in the

---

[124] See *id.* at 143-44, 927 N.W.2d at 356 (quoting *State v. Henderson, supra* note 109).

[125] *State v. Goynes, supra* note 121, 303 Neb. at 143, 927 N.W.2d at 356 (internal quotation marks omitted).

[126] See *id.* (internal quotation marks omitted).

search of Short's residence, which we have already found did not violate the Fourth Amendment, and Short stipulated at trial that the LG smart phone number belonged to him for the dates in question. Thus, the only fruits of the seizure of the phones was the evidence, not also found in the search of data for the phone numbers, derived from the search of the physical phones. Such evidence was minimal and consisted of contacts between Short and Pope, contacts between Short and Harlan, and indications that Short's phone either searched for and accessed or was sent and downloaded news reports on the homicides from a television station's website. Regardless, in our de novo review, we conclude the warrantless seizure of Short's cell phones while he sat in the police cruiser was not unlawful.

[60,61] Warrantless searches and seizures are per se unreasonable under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions, which must be strictly confined by their justifications.[127] These exceptions include searches incident to a valid arrest.[128] In *United States v. Robinson*,[129] the U.S. Supreme Court held that in the case of a lawful custodial arrest, a full search of a person is not only an exception to the Fourth Amendment's warrant requirement, but is also a reasonable search under that amendment.[130]

[62,63] Further, it has been held that a search incident to an arrest can be made before an arrest as long as probable cause for the arrest exists before the search.[131] It does not matter that a defendant is not formally placed under arrest until after a

---

[127] *State v. Voichahoske*, 271 Neb. 64, 709 N.W.2d 659 (2006).

[128] See *id.*

[129] *United States v. Robinson*, 414 U.S. 218, 94 S. Ct. 467, 38 L. Ed. 2d 427 (1973).

[130] See *State v. Hayes*, 3 Neb. App. 919, 535 N.W.2d 715 (1995).

[131] See *State v. Twohig*, 238 Neb. 92, 469 N.W.2d 344 (1991).

search, so long as the fruits of the search are not necessary to support probable cause to arrest.[132]

[64,65] Probable cause to support a warrantless arrest exists only if law enforcement has knowledge at the time of the arrest, based on information that is reasonably trustworthy under the circumstances, which would cause a reasonably cautious person to believe that a suspect has committed or is committing a crime.[133] And under the collective knowledge doctrine, the existence of probable cause justifying a warrantless arrest is tested by the collective information possessed by all the officers engaged in a common investigation.[134]

At the time Short arrived at his residence, law enforcement knew Short's fingerprints had been found on a pricetag near the Neelon homicide, that witnesses who heard gunshots at the time of the Johnson homicide saw two Black males get into a white Chevy Monte Carlo with dealer paper plates, and that a white Chevy Monte Carlo matching the description with in-transits and dealer paper plates was found parked in front of the last known address of Short. Further, the officers testified at trial that, at the time Short arrived at his residence, they believed that these homicides were connected based on the attempted shooting of Johnson in front of the Neelon residence the day before Neelon was shot and killed at her home. This information was reasonably trustworthy under the circumstances and would cause a reasonably cautious person to believe that these homicides were connected, that Short had been present at both homicide scenes, and that Short had committed a crime.

We find as a matter of law there was probable cause to arrest Short when the phones were seized. As such, we need not analyze whether the district court was correct that the phones

---

[132] See *id.*

[133] *State v. Garcia*, 302 Neb. 406, 923 N.W.2d 725 (2019).

[134] *State v. Huff*, 282 Neb. 78, 802 N.W.2d 77 (2011).

would inevitably have been discovered even if Short had not been illegally detained.

Because the phones were seized during a search conducted incident to a warrantless de facto arrest that was supported by probable cause, their seizure did not violate the Fourth Amendment. We affirm the district court's finding that law enforcement did not obtain the phones in violation of the Fourth Amendment.[135]

## VI. CONCLUSION

Short's cell phones were not seized during an unlawful arrest, and the search of his residence was not pursuant to a warrant supported by an affidavit containing intentional or reckless falsities or omissions. The warrants supporting the searches of Short's physical phones, digital call records, and cell site location information were sufficiently particular, and the affidavits supporting the warrants contained sufficient evidence connecting the criminal activity and the place to be searched for law enforcement's reliance thereupon to be in good faith. Whether from the perspective of the constitutional right to a speedy trial, due process, statutory discovery rules, or all combined, the district court did not err in denying Short's motion to dismiss without prejudice or, in the alternative, for absolute discharge. For all these reasons, we find no merit to Short's assignments of error and affirm the judgment below.

AFFIRMED.

---

[135] See *State v. Jennings, supra* note 103.

MILLER-LERMAN, J., concurring.

I concur in the result reached by the court, but write separately simply to remark on the path followed in our analysis with respect to the propriety of the search of the cell phone. In its opinion, this court proceeded to the good faith inquiry without first having resolved the Fourth Amendment issue. In

my view, it would have been advisable to address the merits of the Fourth Amendment claim before proceeding to the good faith issue.

The jurisprudence of cell phone searches is evolving. This case presented an opportunity to resolve certain Fourth Amendment issues before considering the application of the good faith exception to the exclusionary rule. In fact, in *United States v. Leon*, 468 U.S. 897, 925, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984), the origin case of the good faith rule, the Supreme Court recognized that "it frequently will be difficult to determine whether the officers acted reasonably without resolving the Fourth Amendment issue." This is because the Fourth Amendment analysis addresses judicial errors, whereas the good faith analysis addresses subsequent police errors when viewed against settled law.

I argue that there are hazards inherent in deciding the good faith issue without first having resolved the legal issues in the Fourth Amendment claim. The Supreme Court described this argument when it stated that "application of the good-faith exception to searches conducted pursuant to warrants will preclude review of the constitutionality of the search or seizure, deny needed guidance from the courts, or freeze Fourth Amendment law in its present state." *United States v. Leon*, 468 U.S. at 924. But the Supreme Court did not adopt an inflexible practice of requiring a finding that the warrant was inadequate as a predicate to proceeding to the good faith inquiry.

We generally decide cases on the basis on which they were resolved in the trial court. In this case, the trial court addressed the merits of the Fourth Amendment issue and also considered the good faith exception. So our consideration of the good faith issue was invited. We are not alone in addressing the good faith issue without deciding the Fourth Amendment claim. For example, in *U.S. v. White*, 874 F.3d 490 (6th Cir. 2017), the U.S. Court of Appeals for the Sixth Circuit recognized that the trial court had ruled on both the merits of the Fourth Amendment issue and the good faith

exception. In so doing, it said, "[w]e therefore proceed to the good-faith inquiry, assuming, without deciding, that the affidavit failed to establish probable cause." *U.S. v. White*, 874 F.3d at 495-96.

Given the foregoing, I respectfully suggest that, rather than freezing Fourth Amendment cell phone search Nebraska jurisprudence in its present state, we address the merits in the next case.